FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 1 6 2021

JAMES N. HATTEN, Clerk
By: Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| RICKY R. FRANKLIN | § | Civil Action No:1:20-cv-4661-SDG |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| CARRINGTON MORTGAGE | § | |
| SERVICES, LLC | § | |
| and | § | |
| | § | |
| WILMINGTON SAVINGS FUND | § | |
| SOCIETY, FSB AS TRUSTEE OF | § | |
| STANWICH MORTGAGE LOAN | § | |
| TRUST H | § | |
| and | § | |
| JOHN DOE CORPORATION | § | |
| 1 TROUGH 5 | § | |
| all who true names are unknown | § | |
| | § | |
| Defendants | § | |

## **PLAINTIFF'S REPLY TO MOTION TO TAKE JUDICIAL NOTICE**

Plaintiff, by and thru himself, Ricky R. Franklin files his reply in support of his

motion (Dkt 20) to take judicial notice pursuant to FED R. EVID. 201 and

O.C.G.A 24-2-20. In support of this motion, Plaintiff states as follows:

## **ARGUMENT**

The Defendants new tactic is to call the Plaintiffs claim to the original Land Grant from 1821 frivolous. **Assigns forever"...** Is the opinion delivered in 2014 by the Chief Justice of the United States Supreme Court in reference to Land Grants. Citing....*Marvin M. Brandt Revocable Trust v. United States*, 572 U.S.,( page 5) (2014) (Attached as Exhibit A)

What part of forever does the Defendant not understand? To be clear, the years of 1821, 1978, 2014, and 2021 **are all in the forever time frame.** Plaintiff is an assignee to a portion of the Land Grant that is described in his original complaint and as part of the judicial notice (Dkt 20). The Land Grant/Patent that was updated in Henry County Superior Court in May of 2014 and is conveyed as a unbroken chain of title from the state archives of the Georgia to Plaintiff. Under Georgia law, an assignee has all rights as the original assignor by law. See... *O.C.G.A. 44-14-324* As an assignee, whether it is the first, second, or third party to whom the title is conveyed shall lose none of the original rights privileges or immunities of the original grantee of Land Grant/Patent. Citing...U.S. Constitution Article I, Sec 10, Clause 1, "No state shall...impair the obligations of contract." (Exhibit B, Plaintiffs Land Grant)

## A. Judicial Notice

Traditionally, judicial notice has been used to eliminate the need for formal proof by the introduction of evidence of certain matters which either are so

universally known and accepted as to be beyond doubt or matters which, while not universally known, are so certain [] as to be beyond doubt." 60 Am. Jur. Proof of Facts 3d 175 (2001). A Court may take judicial notice of adjudicative facts that are not subject to reasonable dispute where (1) they are generally known within the Court's territorial jurisdiction; or (2) they can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned .See FED.R.EVID. 201(a)-(b).

## B. Validity of Plaintiffs Land Grant Cannot Be Challenged By A Non Party

### i. *Defendants have no standing to challenge Plaintiffs Land Grant*

Defendants are seeking to challenge the validity of a Land Grant when they are not a party to it. In the Defendants motion to dismiss (Dkt 6, MTD at 11), they devoted most of its argument claiming that Plaintiff cannot challenge the validity of assignment and now, in a complete reversal, they are attempting to challenge a Land Grant when they are not a party to it. A person who is not a party to a contract, or an intended third-party beneficiary of a contract, lacks standing to challenge or enforce a contract under Georgia law. *Montgomery v. Bank of Amer.*, 740 S.E.2d 434,437038 (Ga. App. 2013) (A party not part of a contract to the assignment contracts, is not a proper party to challenge the assignments) *Shannon v. Albertelli Firm, P.C.*, 610 Fed. Appx. 866, 872-873 (11th Cir. May 7, 2015) (only a party to an contract has standing to challenge the contract). For this reason,

Plaintiff respectfully requests the Court to issue an order acknowledging him as the true legal owner of his land grant.

*ii. Plaintiffs land grant cannot be declared void*

A Land Grant cannot be declared void. *Hooper et al v. Scheimer* 64 U.S. S. 236 (1859) page 5 ( A grant/patent, when attacked incidentally, cannot be declared void, unless it be procured by actual fraud, or is void on its face, or has been declared void by law) (Attached as Exhibit C) The Defendants would have the Court to believe that Plaintiffs rights as a Land Grant owner is frivolous, never the less, the Defendant fail to explain how this is so. More over, they would need to prove it's frivolous or offer up some other evidence of proof for this claim. been There is no proof of fraud in obtaining Plaintiffs land grant, and this Land Grant should be acknowledged by this Court.

## C. Stare Decisis In This District

This Court has ruled on the very same land grant where the facts are sufficiently similar. In *Bambergs v Regions*, the Chief District Judge Julie E. Carnes ruled that the Land Grant was valid and the Court recognized its validity. Civil action No 1:14-cv-01960 (page 11) (2014). (Plaintiff has shown the Court that they are the true legal owners of the Land Grant/Patent from 1821). (Court ruling, attached as Exhibit D, page 11) (Bambergs Land Grant attached as Exhibit E) Just like the

Bambergs, Plaintiff respectfully requests the Court to issue an order acknowledging him as the true legal owner of his land grant.

## D. Plaintiffs Land Grant Carries The Force As The Original

Under 43 U.S.C. § 83 - U.S. Code - Unannotated Title 43. The public lands acts § 83 gives Plaintiff the right to have his Land Grant admitted as evidence in all Courts in the United States and its territories. (Transcripts of the records in the district land offices, when made and duly certified to by the Secretary of the Interior or such officers as he may designate for individuals, shall be admitted as evidence in all courts of the United States and the Territories thereof, and before all officials authorized to receive evidence, with the same force and effect as the original records). (Attached as Exhibit F) For this reason, Plaintiff respectfully requests the Court to issue an order acknowledging him as the true legal owner of his land grant.

## CONCLUSION

Plaintiff's motion should be granted, and the Court should take judicial notice of Plaintiffs Land Grant pursuant to FED.R.EVID. 201and O.C.G.A 24-2-20

Respectfully submitted, February 16, 2021

Ricky R. Franklin
708 Brambling Way
Stockbridge, GA 30281
678-650-3733
rrfrank12@hotmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was sent via mail on February 16th, 2021 to Defendant's Counsel listed below:

**HOLLAND & KNIGHT LLP**

**GRANT SCHNELL**

**1180 West Peachtree St, NW, Suite 1800**

**Atlanta, GA 30309**

**COUNSEL FOR DEFENDANTS CARRINGTON MORTGAGE SERVICES, LLC AND WILMINGTON SAVINGS FUND SOCIETY, FSB**

Plaintiff, *Pro-Se*

Ricky R. Franklin
708 Brambling Way
Stockbridge, GA 30281

# EXHIBIT A

# SUPREME COURT OF THE UNITED STATES

———

No. 12–1173

———

## MARVIN M. BRANDT REVOCABLE TRUST, ET AL. PETITIONERS *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[March 10, 2014]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

In the mid-19th century, Congress began granting private railroad companies rights of way over public lands to encourage the settlement and development of the West. Many of those same public lands were later conveyed by the Government to homesteaders and other settlers, with the lands continuing to be subject to the railroads' rights of way. The settlers and their successors remained, but many of the railroads did not. This case presents the question of what happens to a railroad's right of way granted under a particular statute—the General Railroad Right-of-Way Act of 1875—when the railroad abandons it: does it go to the Government, or to the private party who acquired the land underlying the right of way?

## I

### A

In the early to mid-19th century, America looked west. The period from the Louisiana Purchase in 1803 to the Gadsden Purchase in 1853 saw the acquisition of the western lands that filled out what is now the contiguous

United States.

The young country had numerous reasons to encourage settlement and development of this vast new expanse. What it needed was a fast and reliable way to transport people and property to those frontier lands. New technology provided the answer: the railroad. The Civil War spurred the effort to develop a transcontinental railroad, as the Federal Government saw the need to protect its citizens and secure its possessions in the West. *Leo Sheep Co.* v. *United States*, 440 U. S. 668, 674–676 (1979). The construction of such a railroad would "furnish a cheap and expeditious mode for the transportation of troops and supplies," help develop "the agricultural and mineral resources of this territory," and foster settlement. *United States* v. *Union Pacific R. Co.*, 91 U. S. 72, 80 (1875).

The substantial benefits a transcontinental railroad could bring were clear, but building it was no simple matter. The risks were great and the costs were staggering. Popular sentiment grew for the Government to play a role in supporting the massive project. Indeed, in 1860, President Lincoln's winning platform proclaimed: "That a railroad to the Pacific Ocean is imperatively demanded by the interests of the whole country; that the Federal Government ought to render immediate and efficient aid in its construction." J. Ely, Railroads and American Law 51 (2001). But how to do it? Sufficient funds were not at hand (especially with a Civil War to fight), and there were serious reservations about the legal authority for direct financing. "The policy of the country, to say nothing of the supposed want of constitutional power, stood in the way of the United States taking the work into its own hands." *Union Pacific R. Co., supra,* at 81.

What the country did have, however, was land—lots of it. It could give away vast swaths of public land—which at the time possessed little value without reliable transportation—in hopes that such grants would increase the appeal

of a transcontinental railroad to private investors. Ely, *supra*, at 52–53. In the early 1860s, Congress began granting to railroad companies rights of way through the public domain, accompanied by outright grants of land along those rights of way. P. Gates, History of Public Land Law Development 362–368 (1968). The land was conveyed in checkerboard blocks. For example, under the Union Pacific Act of 1862, odd-numbered lots of one square mile apiece were granted to the railroad, while even-numbered lots were retained by the United States. *Leo Sheep Co., supra*, at 672–673, 686, n. 23. Railroads could then either develop their lots or sell them, to finance construction of rail lines and encourage the settlement of future customers. Indeed, railroads became the largest secondary dispenser of public lands, after the States. Gates, *supra*, at 379.

But public resentment against such generous land grants to railroads began to grow in the late 1860s. Western settlers, initially some of the staunchest supporters of governmental railroad subsidization, complained that the railroads moved too slowly in placing their lands on the market and into the hands of farmers and settlers. Citizens and Members of Congress argued that the grants conflicted with the goal of the Homestead Act of 1862 to encourage individual citizens to settle and develop the frontier lands. By the 1870s, legislators across the political spectrum had embraced a policy of reserving public lands for settlers rather than granting them to railroads. *Id.,* at 380, 454–456.

A House resolution adopted in 1872 summed up the change in national policy, stating:

> "That in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice

to the whole people requires that the public lands
should be held for the purpose of securing homesteads
to actual settlers, and for educational purposes, as
may be provided by law." Cong. Globe, 42d Cong., 2d
Sess., 1585.

Congress enacted the last checkerboard land-grant statute
for railroads in 1871. Gates, *supra,* at 380. Still wishing
to encourage railroad construction, however, Congress
passed at least 15 special acts between 1871 and 1875
granting to designated railroads "the right of way"
through public lands, without any accompanying land
subsidy. *Great Northern R. Co.* v. *United States,* 315 U. S.
262, 274, and n. 9 (1942).

Rather than continue to enact special legislation for
each such right of way, Congress passed the General
Railroad Right-of-Way Act of 1875, 18 Stat. 482, 43
U. S. C. §§934–939. The 1875 Act provided that "[t]he
right of way through the public lands of the United States
is granted to any railroad company" meeting certain re-
quirements, "to the extent of one hundred feet on each side
of the central line of said road." §934. A railroad company
could obtain a right of way by the "actual construction of
its road" or "in advance of construction by filing a map as
provided in section four" of the Act. *Jamestown & North-
ern R. Co.* v. *Jones,* 177 U. S. 125, 130–131 (1900). Section
4 in turn provided that a company could "secure" its right
of way by filing a proposed map of its rail corridor with a
local Department of the Interior office within 12 months
after survey or location of the road. §937. Upon approval
by the Interior Department, the right of way would be
noted on the land plats held at the local office, and from
that day forward "all such lands over which such right of
way shall pass shall be disposed of subject to the right
of way." *Ibid.*

The 1875 Act remained in effect until 1976, when its

provisions governing the issuance of new rights of way
were repealed by the Federal Land Policy and Manage-
ment Act, §706(a), 90 Stat. 2793. This case requires us to
define the nature of the interest granted by the 1875 Act,
in order to determine what happens when a railroad
abandons its right of way.

B

Melvin M. Brandt began working at a sawmill in Fox
Park, Wyoming, in 1939. He later purchased the sawmill
and, in 1946, moved his family to Fox Park. Melvin's son
Marvin started working at the sawmill in 1958 and came
to own and operate it in 1976 until it closed, 15 years
later.

In 1976, the United States patented an 83-acre parcel of
land in Fox Park, surrounded by the Medicine Bow-Routt
National Forest, to Melvin and Lulu Brandt. (A land
patent is an official document reflecting a grant by a
sovereign that is made public, or "patent.") The patent
conveyed to the Brandts fee simple title to the land "with
all the rights, privileges, immunities, and appurtenances,
of whatsoever nature, thereunto belonging, unto said
claimants, their successors and assigns, forever." App. to
Pet. for Cert. 76. But the patent did include limited excep-
tions and reservations. For example, the patent "except[s]
and reserv[es] to the United States from the land granted
a right-of-way thereon for ditches or canals constructed
by the authority of the United States"; "reserv[es] to the
United States . . . a right-of-way for the existing Platte
Access Road No. 512"; and "reserv[es] to the United States
. . . a right-of-way for the existing Dry Park Road No. 517."
*Id.,* at 76–77 (capitalization omitted). But if those roads
cease to be used by the United States or its assigns for a
period of five years, the patent provides that "the ease-
ment traversed thereby shall terminate." *Id.,* at 78.

Most relevant to this case, the patent concludes by

6     MARVIN M. BRANDT REVOCABLE TRUST *v.*
UNITED STATES
Opinion of the Court

stating that the land was granted "subject to those rights for
railroad purposes as have been granted to the Lar-
amie[,] Hahn's Peak & Pacific Railway Company, its suc-
cessors or assigns." *Ibid.* (capitalization omitted). The
patent did not specify what would occur if the railroad
abandoned this right of way.

The right of way referred to in the patent was obtained
by the Laramie, Hahn's Peak and Pacific Railroad
(LHP&P) in 1908, pursuant to the 1875 Act.[1] The right of
way is 66 miles long and 200 feet wide, and it meanders
south from Laramie, Wyoming, through the Medicine
Bow-Routt National Forest, to the Wyoming-Colorado
border. Nearly a half-mile stretch of the right of way
crosses Brandt's land in Fox Park, covering ten acres of
that parcel.

In 1911, the LHP&P completed construction of its rail-
way over the right of way, from Laramie to Coalmont,
Colorado. Its proprietors had rosy expectations, proclaim-
ing that it would become "one of the most important rail-
road systems in this country." Laramie, Hahns Peak and
Pacific Railway System: The Direct Gateway to Southern
Wyoming, Northern Colorado, and Eastern Utah 24
(1910). But the railroad ultimately fell short of that goal.
Rather than shipping coal and other valuable ores as
originally hoped, the LHP&P was used primarily to
transport timber and cattle. R. King, Trails to Rails: A
History of Wyoming's Railroads 90 (2003). Largely be-
cause of high operating costs during Wyoming winters, the
LHP&P never quite achieved financial stability. It
changed hands numerous times from 1914 until 1935,
when it was acquired by the Union Pacific Railroad at the

---

[1] Locals at the time translated the acronym LHP&P as "Lord Help
Push and Pull" or "Late, Hard Pressed, and Panicky." S. Thybony, R.
Rosenberg, & E. Rosenberg, The Medicine Bows: Wyoming's Mountain
Country 136 (1985).

urging of the Interstate Commerce Commission. *Ibid.*; S. Thybony, R. Rosenberg, & E. Rosenberg, The Medicine Bows: Wyoming's Mountain Country 136–138 (1985); F. Hollenback, The Laramie Plains Line 47–49 (1960).

In 1987, the Union Pacific sold the rail line, including the right of way, to the Wyoming and Colorado Railroad, which planned to use it as a tourist attraction. King, *supra,* at 90. That did not prove profitable either, and in 1996 the Wyoming and Colorado notified the Surface Transportation Board of its intent to abandon the right of way. The railroad tore up the tracks and ties and, after receiving Board approval, completed abandonment in 2004. In 2006 the United States initiated this action seeking a judicial declaration of abandonment and an order quieting title in the United States to the abandoned right of way. In addition to the railroad, the Government named as defendants the owners of 31 parcels of land crossed by the abandoned right of way.

The Government settled with or obtained a default judgment against all but one of those landowners—Marvin Brandt. He contested the Government's claim and filed a counterclaim on behalf of a family trust that now owns the Fox Park parcel, and himself as trustee.[2] Brandt asserted that the stretch of the right of way crossing his family's land was a mere easement that was extinguished upon abandonment by the railroad, so that, under common law property rules, he enjoyed full title to the land without the burden of the easement. The Government countered that it had all along retained a reversionary interest in the railroad right of way—that is, a future estate that would be restored to the United States if the railroad abandoned

---

[2] The other landowners had a potential interest in much smaller acreages: No other party could claim an interest in more than three acres of the right of way, and only six of the 31 potential claims amounted to more than one acre. See Amended Complaint in No. 06–CV–0184J etc. (D Wyo.), ¶¶6–10.

or forfeited its interest.

The District Court granted summary judgment to the Government and quieted title in the United States to the right of way over Brandt's land. 2008 WL 7185272 (D Wyo., Apr. 8, 2008).[3]    The Court of Appeals affirmed. *United States* v. *Brandt,* 496 Fed. Appx. 822 (CA10 2012) *(per curiam).*    The court acknowledged division among lower courts regarding the nature of the Government's interest (if any) in abandoned 1875 Act rights of way.    But it concluded based on Circuit precedent that the United States had retained an "implied reversionary interest" in the right of way, which then vested in the United States when the right of way was relinquished. *Id.,* at 824.

We granted certiorari. 570 U. S. __ (2013).

## II

This dispute turns on the nature of the interest the United States conveyed to the LHP&P in 1908 pursuant to the 1875 Act.    Brandt contends that the right of way granted under the 1875 Act was an easement, so that when the railroad abandoned it, the underlying land (Brandt's Fox Park parcel) simply became unburdened of the easement.    The Government does not dispute that easements normally work this way, but maintains that the 1875 Act granted the railroads something more than an easement, reserving an implied reversionary interest in that something more to the United States.    The Government loses that argument today, in large part because it won when it argued the opposite before this Court more than 70 years ago, in the case of *Great Northern Railway Co.* v. *United States,* 315 U. S. 262 (1942).

In 1907, Great Northern succeeded to an 1875 Act right

---

[3] The District Court dismissed without prejudice Brandt's separate counterclaim for just compensation.    Brandt then filed a takings claim in the Court of Federal Claims.    That case has been stayed pending the disposition of this one.

of way that ran through public lands in Glacier County, Montana. Oil was later discovered in the area, and Great Northern wanted to drill beneath its right of way. But the Government sued to enjoin the railroad from doing so, claiming that the railroad had only an easement, so that the United States retained all interests beneath the surface.

This Court had indeed previously held that the pre-1871 statutes, granting rights of way accompanied by checkerboard land subsidies, conveyed to the railroads "a limited fee, made on an implied condition of reverter." See, *e.g.*, *Northern Pacific R. Co.* v. *Townsend*, 190 U. S. 267, 271 (1903). Great Northern relied on those cases to contend that it owned a "fee" interest in the right of way, which included the right to drill for minerals beneath the surface.

The Government disagreed. It argued that "the 1875 Act granted an easement and nothing more," and that the railroad accordingly could claim no interest in the resources beneath the surface. Brief for United States in *Great Northern R. Co.* v. *United States*, O. T. 1941, No. 149, p. 29. "The year 1871 marks the end of one era and the beginning of a new in American land-grant history," the Government contended; thus, cases construing the pre-1871 statutes were inapplicable in construing the 1875 Act, *id.*, at 15, 29–30. Instead, the Government argued, the text, background, and subsequent administrative and congressional construction of the 1875 Act all made clear that, unlike rights of way granted under pre-1871 land-grant statutes, those granted under the 1875 Act were mere easements.

The Court adopted the United States' position in full, holding that the 1875 Act "clearly grants only an easement, and not a fee." *Great Northern*, 315 U. S., at 271. The Court found Section 4 of the Act "especially persuasive," because it provided that "all such lands *over* which

such right of way shall pass shall be disposed of *subject to* such right of way." *Ibid.* Calling this language "wholly inconsistent" with the grant of a fee interest, the Court endorsed the lower court's statement that "[a]pter words to indicate the intent to convey an easement would be difficult to find." *Ibid.*

That interpretation was confirmed, the Court explained, by the historical background against which the 1875 Act was passed and by subsequent administrative and congressional interpretation. The Court accepted the Government's position that prior cases describing the nature of pre-1871 rights of way—including *Townsend, supra,* at 271—were "not controlling," because of the shift in congressional policy after that year. *Great Northern, supra,* at 277–278, and n. 18. The Court also specifically disavowed the characterization of an 1875 Act right of way in *Rio Grande Western R. Co.* v. *Stringham,* 239 U. S. 44 (1915), as "'a limited fee, made on an implied condition of reverter.'" *Great Northern, supra,* at 278–279 (quoting *Stringham, supra,* at 47). The Court noted that in *Stringham* "it does not appear that Congress' change of policy after 1871 was brought to the Court's attention," given that "[n]o brief was filed by the defendant or the United States" in that case. *Great Northern, supra,* at 279, and n. 20.

The dissent is wrong to conclude that *Great Northern* merely held that "the right of way did not confer one particular attribute of fee title." *Post,* at 3 (opinion of SOTOMAYOR, J.). To the contrary, the Court specifically rejected the notion that the right of way conferred even a "limited fee." 315 U. S., at 279; see also *id.,* at 277–278 (declining to follow cases describing a right of way as a "limited," "base," or "qualified" fee). Instead, the Court concluded, it was "clear from the language of the Act, its legislative history, its early administrative interpretation and the construction placed upon it by Congress in subse-

quent enactments" that the railroad had obtained "only an easement in its rights of way acquired under the Act of 1875." *Id.,* at 277; see *United States* v. *Union Pacific R. Co.,* 353 U. S. 112, 119 (1957) (noting the conclusion in *Great Northern* that, in the period after 1871, "only an easement for railroad purposes was granted"); 353 U. S., at 128 (Frankfurter, J., dissenting) (observing that the Court "conclude[d] in the *Great Northern* case that a right of way granted by the 1875 Act was an easement and not a limited fee").

When the United States patented the Fox Park parcel to Brandt's parents in 1976, it conveyed fee simple title to that land, "subject to those rights for railroad purposes" that had been granted to the LHP&P. The United States did not reserve to itself any interest in the right of way in that patent. Under *Great Northern,* the railroad thus had an easement in its right of way over land owned by the Brandts.

The essential features of easements—including, most important here, what happens when they cease to be used—are well settled as a matter of property law. An easement is a "nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." Restatement (Third) of Property: Servitudes §1.2(1) (1998). "Unlike most possessory estates, easements . . . may be unilaterally terminated by abandonment, leaving the servient owner with a possessory estate unencumbered by the servitude." *Id.,* §1.2, Comment *d; id.,* §7.4, Comments *a, f.* In other words, if the beneficiary of the easement abandons it, the easement disappears, and the landowner resumes his full and unencumbered interest in the land. See *Smith* v. *Townsend,* 148 U. S. 490, 499 (1893) ("[W]hoever obtained title from the government to any . . . land through which ran this right of way would acquire a fee to the whole tract subject to the easement of

the company, and if ever the use of that right of way was
abandoned by the railroad company the easement would
cease, and the full title to that right of way would vest in
the patentee of the land"); 16 Op. Atty. Gen. 250, 254
(1879) ("the purchasers or grantees of the United States
took the fee of the lands patented to them subject to the
easement created by the act of 1824; but on a discontinu-
ance or abandonment of that right of way the entire and
exclusive property, and right of enjoyment thereto, vested
in the proprietors of the soil").[4]

Those basic common law principles resolve this case.
When the Wyoming and Colorado Railroad abandoned the
right of way in 2004, the easement referred to in the
Brandt patent terminated. Brandt's land became unbur-
dened of the easement, conferring on him the same full
rights over the right of way as he enjoyed over the rest of
the Fox Park parcel.

## III

Contrary to that straightforward conclusion, the Gov-
ernment now tells us that *Great Northern* did not really
mean what it said. Emphasizing that *Great Northern*
involved only the question of who owned the oil and min-

---

[4] Because granting an easement merely gives the grantee the right to
enter and use the grantor's land for a certain purpose, but does not give
the grantee any possessory interest in the land, it does not make sense
under common law property principles to speak of the grantor of an
easement having retained a "reversionary interest." A reversionary
interest is "any future interest left in a transferor or his successor in
interest." Restatement (First) of Property §154(1)(1936). It arises
when the grantor "transfers less than his entire interest" in a piece of
land, and it is either certain or possible that he will retake the trans-
ferred interest at a future date. *Id.,* Comment *a.* Because the grantor
of an easement has not transferred his estate or possessory interest, he
has not retained a reversionary interest. He retains all his ownership
interest, subject to an easement. See *Preseault* v. *United States,* 100
F. 3d 1525, 1533–1534 (CA Fed. 1996) (en banc).

erals beneath a right of way, the Government asks the Court to limit its characterization of 1875 Act rights of way as "easements" to that context. Even if the right of way has some features of an easement—such as granting only a surface interest to the railroad when the Government wants the subsurface oil and minerals—the Government asks us to hold that the right of way is not an easement for purposes of what happens when the railroad stops using it. But nothing in the text of the 1875 Act supports such an improbable (and self-serving) reading.

The Government argues that the similarity in the language of the 1875 Act and the pre-1871 statutes shows that Congress intended to reserve a reversionary interest in the lands granted under the 1875 Act, just as it did in the pre-1871 statutes. See Brief for United States 17–18. But that is directly contrary to the very premise of this Court's decision (and the Government's argument) in *Great Northern*: that the 1875 Act granted a fundamentally different interest in the rights of way than did the predecessor statutes. 315 U. S., at 277–278; see U. S. *Great Northern* Brief 30 ("[Great Northern's] argument . . . fails because it disregards the essential differences between the 1875 Act and its predecessors."). Contrary to the Government's position now—but consistent with the Government's position in 1942—*Great Northern* stands for the proposition that the pre-1871 statutes (and this Court's decisions construing them) have little relevance to the question of what interest the 1875 Act conveyed to railroads.

The Government next contends that this Court's decisions in *Stalker* v. *Oregon Short Line R. Co.*, 225 U. S. 142 (1912), and *Great Northern R. Co.* v. *Steinke*, 261 U. S. 119 (1923), support its position that the United States retains an implied reversionary interest in 1875 Act rights of way. Brief for United States 28–32. According to the Government, both *Stalker* and *Steinke* demonstrate that those

rights of way cannot be bare common law easements,
because those cases concluded that patents purporting to
convey the land underlying a right of way were "inopera-
tive to pass title." Brief for United States 31 (quoting
*Steinke, supra,* at 131); see also Tr. of Oral Arg. 28–30, 33,
40–41, 44–45. If the right of way were a mere easement,
the argument goes, the patent would have passed title to
the underlying land subject to the railroad's right of way,
rather than failing to pass title altogether. But that is a
substantial overreading of those cases.

In both *Stalker* and *Steinke,* a railroad that had already
obtained an 1875 Act right of way thereafter claimed
adjacent land for station grounds under the Act, as it was
permitted to do because of its right of way. A homesteader
subsequently filed a claim to the same land, unaware of
the station grounds. The question in each case was
whether the railroad could build on the station grounds,
notwithstanding a subsequent patent to the homesteader.
The homesteader claimed priority because the railroad's
station grounds map had not been recorded in the local
land office at the time the homesteader filed his claim.
This Court construed the 1875 Act to give the railroad
priority because it had submitted its proposed map to the
Department of the Interior before the homesteader filed
his claim. See *Stalker, supra,* at 148–154; *Steinke, supra,*
at 125–129.

The dispute in each case was framed in terms of compet-
ing claims to the right to acquire and develop the same
tract of land. The Court ruled for the railroad, but did not
purport to define the precise nature of the interest granted
under the 1875 Act. Indeed, it does not appear that the
Court in either case considered—much less rejected—an
argument that the railroad had obtained only an easement
in the contested land, so that the patent could still convey
title to the homesteader. In any event, to the extent that
*Stalker* and *Steinke* could be read to imply that the rail-

roads had been granted something more than an ease-
ment, any such implication would not have survived this
Court's unequivocal statement in *Great Northern* that the
1875 Act "clearly grants only an easement, and not a fee."
315 U. S., at 271.

Finally, the Government relies on a number of later
enacted statutes that it says demonstrate that Congress
believed the United States had retained a reversionary
interest in the 1875 Act rights of way. Brief for United
States 34–42. But each of those statutes purported only to
dispose of interests the United States already possessed,
not to create or modify any such interests in the first
place. First, in 1906 and 1909, Congress declared forfeited
any right of way on which a railroad had not been con-
structed in the five years after the location of the road. 43
U. S. C. §940. The United States would "resume[ ] the full
title to the lands covered thereby free and discharged of
such easement," but the forfeited right of way would im-
mediately "inure to the benefit of any owner or owners of
land conveyed by the United States prior to such date."
*Ibid.*

Then, in 1922, Congress provided that whenever a
railroad forfeited or officially abandoned its right of way,
"all right, title, interest, and estate of the United States
in said lands" (other than land that had been converted
to a public highway) would immediately be transferred to
either the municipality in which it was located, or else to
the person who owned the underlying land. 43 U. S. C.
§912. Finally, as part of the National Trails System Im-
provements Act of 1988, Congress changed course and
sought to retain title to abandoned or forfeited railroad
rights of way, specifying that "any and all right, title,
interest, and estate of the United States" in such rights of
way "shall remain in the United States" upon abandon-
ment or forfeiture. 16 U. S. C. §1248(c).

The Government argues that these statutes prove that

Congress intended to retain (or at least believed it had retained) a reversionary interest in 1875 Act rights of way. Otherwise, the argument goes, these later statutes providing for the disposition of the abandoned or forfeited strips of land would have been meaningless. That is wrong. This case turns on what kind of interest Congress granted to railroads in their rights of way in 1875. Cf. *Leo Sheep Co.*, 440 U. S., at 681 ("The pertinent inquiry in this case is the intent of Congress when it granted land to the Union Pacific in 1862."). *Great Northern* answered that question: an easement. The statutes the Government cites do not purport to define (or redefine) the nature of the interest conveyed under the 1875 Act. Nor do they shed light on what kind of property interest Congress intended to convey to railroads in 1875. See *United States* v. *Price*, 361 U. S. 304, 313 (1960) ("the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").

In other words, these statutes do not tell us whether the United States has an interest in any particular right of way; they simply tell us how any interest the United States might have should be disposed of. For pre-1871 rights of way in which the United States retained an implied reversionary interest, or for rights of way crossing public lands, these statutes might make a difference in what happens to a forfeited or abandoned right of way. But if there is no "right, title, interest, [or] estate of the United States" in the right of way, 43 U. S. C. §912, then the statutes simply do not apply.

We cannot overlook the irony in the Government's argument based on Sections 912 and 940. Those provisions plainly evince Congress's intent to divest the United States of any title or interest it had retained to railroad rights of way, and to vest that interest in individuals to whom the underlying land had been patented—in other words, people just like the Brandts. It was not until

1988—12 years after the United States patented the Fox Park parcel to the Brandts—that Congress did an about-face and attempted to reserve the rights of way to the United States. That policy shift cannot operate to create an interest in land that the Government had already given away.[5]

\*   \*   \*

More than 70 years ago, the Government argued before this Court that a right of way granted under the 1875 Act was a simple easement. The Court was persuaded, and so ruled. Now the Government argues that such a right of way is tantamount to a limited fee with an implied reversionary interest. We decline to endorse such a stark change in position, especially given "the special need for certainty and predictability where land titles are concerned." *Leo Sheep Co., supra*, at 687.

The judgment of the United States Court of Appeals for the Tenth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# EXHIBIT B

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO

Ricky R. Franklin
708 Brambling Way
Stockbridge, GA 30281

SEAL OF HENRY SUPERIOR COURT · A.D. 1822 · GEORGIA

Doc ID: 016771190012 Type: MISC
Recorded: 05/29/2014 at 11:33:13 AM
Fee Amt: $30.00 Page 1 of 12
Henry, GA Clerk of Superior Court
Barbara Harrison Clerk of Court
BK 13587 PG 216-227

# DECLARATION OF ASSIGNEE'S UPDATE OF LAND GRANT

TO WHOMEVER IT MAY CONCERN:

This DECLARATION is directed to be attached to all deeds and/or conveyances in the name of the parties above shown as requesting recording of this document, in a manner known a nunc pro tunc (as it should have been from the beginning).

KNOWN YE ALL MEN THAT BY THESE PRESENTS: I **Ricky R. Franklin** DO SEVERALLY CERTIFY AND DECLARE THAT I BRING UP THE LAND GRANT IN MY NAME. THE ASSIGNEE TO THE LAND GRANT THAT IS FILED AND KNOWN AS, THE 4TH GEORGIA LAND LOTTERIES OF 1821: REGISTERED AS 1821 LAND LOTTERY HENRY COUNTY REGISTER OF GRANTS

SAID COPY OF WHICH IS ATTACHED HERETO.

1. I, FURTHER CERTIFY THAT I AM THE ASSIGNEE TO A PORTION OF SAID GRANT WHICH IS LEGALLY DESCRIBED AS ATTACHED HERETO AND MADE PART HERETO AND MADE APART HERETO AND MADE APART HEREOF BEING THE ONLY WAY A PERFECT, PARAMOUNT, AND ALLODIAL TITLE CAN BE HAD IN My NAME, AND PARTICULARLY THE FOLLOWING DESCRIBED LAND SO SOUGHT TO BE GRANTED:

**ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 5 OF THE 12TH DISTRICT AND LAND LOT 12 OF THE 6TH DISTRICT, HENRY COUNTY, GEORGIA, BEING LOT 162, AVIAN FOREST SUBDIVIVISION, PHASE III, SECTION A, A PER PLAT RECORDED IN PLAT BOOK 35, PAGE 243-245, HENRY COUNTY RECORDS, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.**

1

GEORGIA, HENRY COUNTY
I CERTIFY THAT THE FOREGOING
IS A TRUE AND EXACT COPY OF THE
ORIGINAL WHICH APPEARS OF RECORD
IN THIS OFFICE. BK 13587
PG 216-227
IN WITNESS WHEREOF I HAVE
THIS 2nd DAY OF June, 2014
AFFIXED MY SEAL AND SIGNATURE
Jacqueline S. Young, Deputy Clerk
BARBARA A. HARRISON - HENRY SUPERIOR COURT

# STATE OF GEORGIA



The Georgia Archives, University System of Georgia

I, Christopher M. Davidson, J.D., Director of The Georgia Archives, do hereby certify that the one page document hereto attached and made part of this certificate is a true and correct copy of page 1 of 1821 Land Lottery Henry County Register of Grants, showing Henry County, District 12, Land Lot 5, and I further certify that the described grant book is on file and of official record in the Archives of the State of Georgia.

IN TESTIMONY WHEREOF, I have set my hand and affixed the Official Seal of the State of Georgia this twenty-ninth day of April, 2014

*Christopher M. Davidson*

Director, The Georgia Archives



IF THIS DECLARATION OF LAND GRANT IS NOT CHALLENGED BY SOMEONE IN A COURT OF LAW WITHIN SIXTY (60) DAYS FROM THE DATE OF FILING, THE ABOVE DESCRIBED PROPERTY SHALL BECOME MINE AS ALLODIAL FREEHOLD, AND THEN THIS LAND GRANT SHALL BE UPDATED IN MY NAME, SUBJECT TO THE LIMITATION STATED HEREIN.

2. NOTICE OF PRE-EMPTIVE RIGHT. PURSUANT TO THE DECLARATION OF INDEPENDENCE(1776), THE TREATY OF PEACE WITH GREAT BRITAIN (8STAT) KNOWN AS THE TREATY OF PARIS [1793] AN ACT OF CONGRESS [3STAT.566, APRIL 24, 1824], THE OREGON TREATY [9STAT.869, JUNE 15, 1846], THE HOMESTEAD ACT [12STAT.392, 1862] AND 43 USC SECTIONS 57, 59, AND 83; THE RECEIPIENT HEREOF IS MANDATED BY ART. VI SECTIONS 1, 2, AND 3; ART. IV SECTIONS I CL. 1&2; SECTION 2 CL. 1 8t 2; SECTION 4; THE 4TH, 7TH, 9TH, AND 10TH AMENDMENTS [U.S. CONSTITUTION, 1781-91] TO ACKNOWLEDGE ASSIGNEE'S UPDATE OF GRANT OR PATENT PROSECUTED BY AUTHORITY OF ART. III SECTION 2 CL. 1&2 ENFORCED BY ORIGINAL/EXCLUSIVE JURISDICTION THEREUNDER AND IT IS THE ONLY WAY TO PERFECT TITLE CAN BE HAD IN MY NAME, WILCOX vs JACKSON, 13 PET. (U.S.) 498, 101. ED 264; ALL QUESTIONS OF FACT DECIDED BY THE GENERAL LAND OFFICE ARE BINDING EVERYWHERE. AND INJUNCTIONS AND MANDAMUS PROCEEDING WILL NOT LIE AGAINST IT, LITCHFIELD vs. THE REGISTER, 9 WALL (U.S.) 575, 19L. ED. 681. THIS DOCUMENT IS INSTRUCTED TO BE ATTACHED TO ALL DEEDS AND/OR CONVEYANCE IN THE NAME OF THE ABOVE PARTY.

3. LAWS OF THE LAND; THIS GRANT IS PROTECTED THROUGH THE CREATION ON THE LAWS OF THE STATE OF GEORGIA OF THE GENERAL ASSEMBLY OF DEC. 1837; THE CONSTITUTION OF THE UNITED STATES; THE CONSTITUION OF THE STATE OF GEORGIA AS AMENDED; HIS EXCELLENCY JOHN CLARK GOVERNOR AND COMMANDER IN CHIEF OF THE ARMY AND NAVY OF THIS STATE, AND OF THE MILITIA THEREOF; AN ACT TO MAKE DISTRIBUTION OF THE LATE CESSION OF LANDS, OBTAINED FROM THE CREEK NATION BY THE UNITED STATES COMMISSIONERS, IN A TREATY ENTERED INTO AT OR NEAR FORT WILKINSON, ON THE 16TH DAY OF JUNE, 1802-APPROVED MAY 11, 1803. VOL II. 100.; AN ACT TO DISPOSE OF AND DISTRIBUTE THE LANDS LATELY ACQUIRED BY THE UNITED STATES FOR THE USE OF GEORGIA, OF THE CREEK NATION OF INDIANS, BY A TREATY MADE AND CONCLUDED AT THE INDIAN SPRINGS, ON THE 8TH DAY OF JANUARY, 1821; AND TO ADD THE RESERVE AT FORT HAWKINS TO THE COUNTY OF JONES APPROVED MAY 15, 1821. VOL IV. 246; THIS EMBRACES THE TERRITORY BETWEEN THE OCMULGEE AND FLINT, ABOVE IRWIN AND BELOW COBB COUNTY.

4. Legal description of HENRY COUNTY

ALL THAT PART OF SAID TERRITORY WHICH LIES EAST OF THE LAST-MENTIONED LINE, AND A LINE
COMMENCING AT THE CORNER OF MONROE COUNTY TO THE CHATTAHOOHEE, SHALL FORM ONE
OTHER COUNTY TO BE CALLED HENRY.

5. DISCLAIMER; NO CLAIM IS MADE HEREIN THAT I HAVE BEEN ASSIGNED THE ENTIRE TRACT OF
LAND AS DESCRIBED IN ORIGINAL GRANT, MY ASSIGNMENT IS INCLUSIVE ONLY TO THE ATTACHED
OR ABOVE LISTED LEGAL DESCRIPTION. THE FILING OF THIS DECLARATION OF LAND GRANT SHALL
NOT DENY OR INFRINGE ON ANY RIGHT, PRIVILEGE OR IMMUNITY OR ANY OTHER ASSIGNEE TO ANY
OTHER PORTION OF LAND COVERED IN THE ABOVE DESCRIBED GRANT.


MEMORANDUM OF LAW ON RIGHTS, PRIVILEGES AND IMMUNITIES

ALLODIAL, FREE; NOT HOLDEN OR ANY LORD OR SUPERIOR; OWNED WITHOUT OBLIGATION OF
VASSALAGE OR FEALTY: THE OPPOSITE OF FEUDAL. Baker V. Dayton, 28 Wis. 384; Wallace V.
Harmstad, 44 Pa. 499: (Black's Law Dictionary, 4th Edition).

ALLODIUM. LAND HELD ABSOLUTELY IN ONE'S OWN

RIGHT, AND NOT OF ANY SUPERIOR; LAND NOT SUBJECT TO

THE GRANT ALONE PASSES LAND FROM the united States of America TO THE STATE OF GEORGIA TO
THE GRANTEE AND NOTHING PASSES A PERFECT TITLE TO PUBLIC LANDS BUT A GRANT/PATENT.
Wilcox v. Jackson, 13 Peter (US) 498;

AS ASSIGNEE, WHETHER HE BE THE FIRST, SECOND OR THIRD PARTY TO WHOM THE TITLE IS
CONVEYED SHALL LOSE NONE OF THE ORIGINAL RIGHTS PRIVILEGES OR IMMUNITIES OF THE
ORIGINAL GRANTEE OF LAND GRANT/PATENT. The U.S. Constitution STATES IN ARTICLE I, SECTION
10, CLAUSE 1, "No state shall ... impair the obligations of contract.";

IMMUNITY FROM COLLATERAL ATTACK: Collins v. Bartlett, 44Cal 371: Webber v. Pere Marquete Boom
Co., 62 Mich 626, 30 NW 469: Surgest v. Dow, 24 Miss 118L Pittsmont: Copper Co. v. Vanina, 71
Mont 44 Pac 461 Green v. Barker, 47 Neb 934 66 NW 1032.

GEORGIA, HENRY COUNTY
I CERTIFY THAT THE FOREGOING
IS A TRUE AND EXACT COPY OF THE
ORIGINAL WHICH APPEARS OF RECORD
IN THIS OFFICE. BK _____ 6306
PG _____ 98-99
IN WITNESS WHEREOF I HAVE
THIS _21_ DAY OF __April 2014__
AFFIXED MY SEAL AND SIGNATURE
_____Barbara Harrison_____
BARBARA A. HARRISON - HENRY SUPERIOR COURT

DOC# 047490
FILED IN OFFICE
08/28/2003
02:25:00PM
BK:06306 PG:0098
JUDITH A. LEWIS
CLERK OF
SUPERIOR COURT
HENRY COUNTY, GA



RETURN DOCUMENT TO:
THE LAW OFFICES OF SAM MAGUIRE, JR., P.C.
4840 ROSWELL RD., BLDG. E-400
ROSWELL, GEORGIA 30342
(404)257-8885
FILE #0327930

REAL ESTATE TRANSFER TAX
HENRY COUNTY
SUPERIOR COURT

AUG 2 8 2003

PAID $_____ 142.60
_____
CLERK OF SUPERIOR COURT

## WARRANTY DEED

STATE OF GEORGIA
COUNTY OF FULTON

   This Indenture made this 21st day of July, in the year 2003, between D. R. HORTON, INC. - TORREY, A DELAWARE CORPORATION, of the County of FULTON, State of Georgia, as party or parties of the first part, hereinafter called Grantor, and RICKY R. FRANKLIN, as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

   W I T N E S S E T H that:  Grantor, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other good and valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee,

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 5 OF THE 12TH DISTRICT AND LAND LOT 12 OF THE 6TH DISTRICT, HENRY COUNTY, GEORGIA, BEING LOT 162, AVIAN FOREST SUBDIVISION, PHASE III, SECTION A, AS PER PLAT RECORDED IN PLAT BOOK 35, PAGE 243-245, HENRY COUNTY RECORDS, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

This Deed is given subject to all easements and restrictions of record, if any.

   TO HAVE AND TO HOLD the said tract or parcel of land, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantee forever in FEE SIMPLE.

   AND THE SAID Grantor will warrant and forever defend the right and title to the above described property unto the said Grantee against the claims of all persons whomsoever.

   IN WITNESS WHEREOF, Grantor has hereunto set grantor's hand and seal this day and year first above written.

Signed, sealed and delivered in the presence of:

D. R. HORTON, INC. - TORREY,
A DELAWARE CORPORATION

_____
Witness

By: _____ (Seal)
ASST. SECRETARY

_____
Notary Public

By: _____ (Seal)

(Corporate Seal)



SEAL OF HENRY SUPERIOR COURT — A.D. 1822 — GEORGIA

Approved for recording

Director, Henry County Building Department / Henry County Board of Commissioners — Date 7/26/02

**City of Stockbridge Approval:**

THIS PLAT HAS BEEN SUBMITTED TO AND CONSIDERED BY THE CITY OF STOCKBRIDGE LOCATED IN HENRY COUNTY GEORGIA AND IS APPROVED ON THIS 26th DAY OF July 2002

7-26-02

MAYOR, City of Stockbridge

**STATE OF GEORGIA - HENRY COUNTY:**

THE OWNER OF THE LAND SHOWN ON THIS PLAT AND WHOSE NAME IS SUBSCRIBED HERETO, IN PERSON OR THROUGH A DULY AUTHORIZED AGENT, ACKNOWLEDGES THIS PLAT WAS MADE FROM AN ACTUAL SURVEY AND DEDICATES TO THE USE OF THE PUBLIC FOREVER ALL STREETS, PARKS, WATER COURSES, DRAINS, EASEMENTS AND PUBLIC PLACES HEREON SHOWN FOR THE PURPOSES AND CONSIDERATIONS THEREIN EXPRESSED.

7/8/02

SANTA-MARIE DEVELOPMENT
1549 VALLEY RESERVE COURT - KENNESAW, GEORGIA 30152 DATE
(24 HOUR CONTACT - TOM LASANTA PHONE: (770) 427-3770)

**NOTE:**

THERE ARE WETLANDS LOCATED ON THE PROJECT SITE AS SHOWN. DISTURBANCE IS PROPOSED WITHIN THE WETLANDS AREA.

**FLOOD NOTE:**

A PORTION OF THIS SITE LIES WITHIN A DESIGNATED FLOOD HAZARD AREA (ZONE A4) AS SHOWN. FLOOD AREA SHOWN IS PER HENRY COUNTY F.I.R.M. FLOOD MAP PANEL NO. 130468 0070 B.

**NOTES:**

SIDEWALKS REQUIRED BOTH SIDES OF STREET. 4' WIDE & 2' BEHIND CURB AND HANDICAP ACCESSIBLE AT ALL CORNERS. PRIOR TO RELEASE OF 2 YEAR MAINTENANCE BOND ALL SIDEWALKS MUST BE COMPLETED.

**WETLANDS NOTE:**

WETLANDS SHOWN ON THIS PLAT ARE UNDER THE JURISDICTION OF THE U.S. ARMY CORPS OF ENGINEERS. LOT OWNERS MAY BE SUBJECT TO PENALTY BY LAW FOR DISTURBANCE TO THESE WETLAND AREAS WITHOUT PROPER AUTHORIZATION.

THE FIELD DATA UPON WHICH THIS PLAT IS BASED HAS A CLOSURE PRECISION OF ONE FOOT IN 47,3000 FEET AND AN ANGULAR ERROR OF 02" PER ANGLE POINT AND WAS ADJUSTED USING THE COMPASS RULE. THIS PLAT HAS BEEN CALCULATED FOR CLOSURE AND WAS FOUND TO BE ACCURATE WITHIN ONE FOOT IN 100,000 FEET. EQUIPMENT USED: TOPCON GTS 313

**SURVEYOR'S CERTIFICATION**

I HEREBY CERTIFY THAT THIS PLAT WAS MADE FROM A TRUE AND CORRECT SURVEY MADE ON THE GROUND UNDER MY SUPERVISION AND THAT IRON PINS WERE PLACED AT ALL LOT CORNERS AND THAT THIS PLAT MEETS ALL THE REQUIREMENTS OF THE LAW AND OF HENRY COUNTY.

7-25-02

RICKY L. NIXON, R.L.S. — DATE

GEORGIA REGISTERED PROFESSIONAL LAND SURVEYOR No. 2373 RICKY L. NIXON

LANDMARK SURVEYING & PLANNING, INC.
Hudson 75 Business Park
218 Willis Drive
Stockbridge, Ga. 30281
Phone: (770) 507-3387
Fax: (770) 507-3389

- land surveying
- land planning
- land development design
- construction layout

LIMITS OF WETLANDS STUDY BY STANTEC CONSULTING SERVICES DATED DECEMBER 13, 2001

PB 35 PG 244

HENRY COUNTY MAP 310
ALL BLOCK 1
PARCEL #'s
SAME AS LOT #'s

FILED IN OFFICE
HENRY COUNTY
SUPERIOR COURT

JUL 30 2002 / 11:36 AM

CLERK OF SUPERIOR COURT

GEORGIA, HENRY COUNTY
I CERTIFY THAT THE FOREGOING IS A TRUE AND EXACT COPY OF THE ORIGINAL WHICH APPEARS OF RECORD IN THIS OFFICE, BK 35 PG 244-244
IN WITNESS WHEREOF I HAVE THIS 21 DAY OF April 2014 AFFIXED MY SEAL AND SIGNATURE
BARBARA A. HARRISON - HENRY SUPERIOR COURT

**GENERAL NOTES:**

ZONING: RM
SETBACKS: FRONT-20' SIDE-6' REAR-25'
TOTAL NO. OF LOTS: 52 (PHASE III SECTION A)
TOTAL LIN. FT. STREET: 1,102 (PHASE III-SECTION A)
GROSS AREA: 12.85 ACRES (PHASE III-SECTION A)
NET AREA: 10.9 ACRES (PHASE III-SECTION A)
GROSS LOT DENSITY: 4.04
NET LOT DENSITY: 4.77
MIN. HOUSE SIZE: 1,400 SQFT (HEATED SPACE)
WATER & SEWER BY: HENRY COUNTY
ELECTRIC SERVICE BY: GEORGIA POWER

GRAPHIC SCALE 1"=50' — 0, 25, 50, 125, 250

**OWNER/DEVELOPER:**

SANTA MARIE DEVELOPMENT
1549 VALLEY RESERVE COURT
KENNESAW, GEORGIA 30152

**24 HOUR CONTACT:**

TOM LASANTA
PHONE: (770) 427-3770

**FINAL PLAT OF:**

# AVIAN FOREST

## PHASE III
## SECTION A
## SHEET 2 OF 3

LOCATED IN LAND LOTS 4 & 5 OF THE 12th DISTRICT
LOCATED IN LAND LOT 12 OF THE 6th DISTRICT
HENRY COUNTY, GEORGIA

DATE: MAY 2, 2002 — SCALE: 1"=50'

I _Tatiana Fritzgerald_, being duly sworn on oath, deposes and says: that as signer to this DECLARATION OF HOMESTEAD, all statements made herein are true and correct to the best of my knowledge and belief.

On this _29_ day of _May_, _2014_ before me, _Tatiana Fritzgerald_, personally appeared Ricky R. Franklin, know to me (or satisfactorily proven) to the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same as Homestead for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal

_____
Notary Public

_____
Title (and Rank)
My commission expires _02/06/2018_

TATIANA FRITZGERALD
CLAYTON COUNTY, GEORGIA
NOTARY PUBLIC
MY COMMISSION EXPIRES
02/06/2018

2

When Recorded, Return to:

Ricky R. Franklin
708 Brambling Way
Stockbridge, GA 30281

# DECLARATION OF HOMESTEAD

1. I, Ricky R. Franklin, DO HEREBY DELCARE:

2. THAT MY MAILING ADDRESS FOR MY HOMESTEAD IS:
   708 Brambling Way
   Stockbridge, GA 30281

3. I am now residing on the Land and premises located in the city of Stockbridge, County of Henry, State of Georgia, known and legally described as:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 5 OF THE 12TH DISTRICT AND LAND LOT 12 OF THE 6TH DISTRICT, HENRY COUNTY, GEORGIA, BEING LOT 162, AVIAN FOREST SUBDIVIVISION, PHASE III, SECTION A, A PER PLAT RECORDED IN PLAT BOOK 35, PAGE 243-245, HENRY COUNTY RECORDS, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY REFERENCE.

4. I am DECLARED HOMESTEAD HEAD OF HOUSEHOLD OWNER OF THE DECLARED HOMESTEAD.

5. NO FORMER DECLARATION OF HOMESTEAD HAS BEEN MADE BY ME EXCEPT AS HAS BEEN ABANDONED.

DATE: 26-MAY _____ 2014 _____
                              Signature:  Ricky R. Franklin

STATE OF GEORGIA
COUNTY OF HENRY

1

... of ... in this State, I HAVE GIVEN ... ... ... in the name and behalf of this State, DO GIVE AND GRANT, unto

*Sands Standley of Fayette district*
*Troup County* ...

heirs and assigns forever, all that Tract or Lot of Land, containing two hundred two and a half acres, situate, lying and being in the *Sixth* district of *Henry* county, in the ... ... That the Lot of Land is known and distinguished in the plan of said county by the number *Twelve* ... ... form and marks as appear by a plat of the same herewith annexed: To HAVE AND TO HOLD the said tract or lot of land, together with all and singular the rights, members and appurtenances thereof, whatsoever, unto the said *Sands Standley* ... ... *his* heirs and assigns, to *his* ... and their proper use, benefit and behoof forever in fee simple.

GIVEN under my hand and the Great Seal of the State, this *twenty second* day of *November* in the year of our Lord eighteen hundred and *twenty three* and of the forty *Eighth* year of American Independence.

*G M Troup*

Signed by His Excellency the Governor, the
*22* day of *November* 1823 }

*Mirabeau B Lamar* S.E.D.

Registered the *28* day of *November* 1823.

# STATE OF GEORGIA



The Georgia Archives, University System of Georgia

I, Christopher M. Davidson, J.D., Director of The Georgia Archives, do hereby certify that the one page document hereto attached and made part of this certificate is a true and correct copy of page 113 of 1821 Land Lottery Henry County Register of Grants, showing Henry County, District 6, Land Lot 12, and I further certify that the described grant book is on file and of official record in the Archives of the State of Georgia.

IN TESTIMONY WHEREOF, I have set my hand and affixed the Official Seal of the State of Georgia this twenty-ninth day of April, 2014

Director, The Georgia Archives



_____ Clark _____ Governor and _____ of the Army and Navy of this State and _____ the Militia thereof.

TO ALL TO WHOM THESE PRESENTS SHALL COME, GREETING:

_____ That in pursuance of an act of the General Assembly _____ of May, 1821, for making distribution of the land lately acquired of _____ nation of Indians, and forming the counties of Dooly, Houston, Monroe, Fayette and Henry, in this State, I HAVE GIVEN AND GRANTED, and by these presents, in the name and behalf of this State, DO GIVE AND GRANT, unto *Henry G. Ezell of Whites District Jasper County his* _____ " _____ " heirs and assigns forever, all that Tract or Lot of Land, containing two hundred two and a half acres, situate, lying and being in the *Twelfth* _____ district of *Henry* _____ county, in the said State, which said Tract or Lot of Land is known and distinguished in the plan of said district by the Number *Five* having such shape, form and marks as appear by a plat of the same hereunto annexed : To have and to hold the said tract or lot of land, together with all and singular the rights, members and appurtenances thereof, whatsoever, unto the said *Henry G Ezell his* _____ " _____ heirs and assigns; to *his* _____ and their proper use, benefit and behoof forever in fee simple.

GIVEN under my hand and the Great Seal of the State, this *Eighth* day of *December* in the year of our Lord eighteen hundred and *twenty one* and of the forty *sixth* year of American Independence.

Signed by His Excellency the Governor, the 8th day of *December* 1821 } *John Clark*

*John Burch* S. E. D.

Registered the *Twenty third* day of *March* 1822

Acknowledgment/Jurat

DATE: _May 28_ 2014 _Ricky_
                         Signature: Ricky R. Franklin

Witness _Fatina Harrington_

STATE OF GEORGIA
COUNTY OF HENRY

On this _28_ day of _May_, _2014_ before me,
_Tatiana Fritzgerald_, personally appeared Ricky R. Franklin, know to me (or satisfactorily proven) to the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same as Homestead for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal

_Tatiana Fritzgerald_
Notary Public

_Parker_
Title (and Rank)
My commission expires _02/06/2018_

| Documents | Grantee Assignee Notice of update of Land Grant, Stapled 4 pages |
| Exhibit A | Original Land Grant from Georgia Division of Archives and History, 4 pages, |
| Exhibit B | Certified Plat, 1 Page, |
| Exhibit C | Certified Warranty Deed |
| Exhibit D | Homestead declaration, 2 pages. |

# EXHIBIT C

# Hooper et al. v. Scheimer

64 U.S. 235 (1859)
Decided Jan 1, 1859

DECEMBER TERM, 1859.

It is the settled doctrine of this court, that no action of ejectment will lie on an entry made with the register and receiver of the land office, such being merely an equitable title, notwithstanding a State Legislature may have
236 provided otherwise by statute. *236 The law is only binding on the State courts, and has no force in the Circuit Courts of the Union. It is also the settled doctrine of this court, that a patent carries the fee, and is the best title known to a court of law.

The case was submitted on printed arguments by *Mr. Stillwell* for the plaintiffs in error, and *Mr. Hempstead* for the defendant.

*Mr. Stillwell's* first point was this: Can the plaintiffs, claiming under a grant of pre-emption, recover against the defendant, claiming under a patent issued subsequent to the pre-emption?

We respectfully submit, that by the act of Congress of 29th May, 1830, the N.W. fractional quarter section 2, 1 N., 12 W., was appropriated to the use of the occupant, Nathan Cloyes, was not subject to be granted to any
238 other person, by *238 Congress or any officer of the United States, until the expiration of the time allowed him to make payment therefor, by that act and the act of 15th July, 1832; and it appearing that payment was made by his heirs within the time, the patent was void.

Perry *v.* O'Hanlon, 11 Missouri Rep., 595.

McAfee *v.* Keirn, 7 Smed. and Marsh Rep., 789.

Nicks *v.* Rector, 4 Ark. Rep., 283, 284.

Wynn *v.* Garland, 16 Ark. Rep., 454.

13 Pet. Rep., 513; 6 Ib., 738.

5 Wheat. Rep., 303.

Cromelin *v.* Waiter, 9 Ala. Rep., (N.S.,) 605.

Stoddard *v.* Chambers, 2 How. Rep., 318.

10 Smed. and Marsh, (Miss.,) 461.

7 Smed. and Marsh, (Miss.,) 366.

2 Laws Ins. and Ops., p. 16, No. 15.

2 Laws Ins. and Ops., No. 39, 40, p. 1045.



8 Mo. Rep., 94.

6 Cow. Rep., 282.

A pre-emption is a legal vested right.

9 How. U.S.R., 333.

4 Ark. Rep., 283.

The patent issued to Gov. Pope being void, as issued without authority, may be impeached in a court of law.

6 Cond. Rep., 358; 10 Johns. Rep., 26.

4 Cond. Rep., 653; 5 Cond Rep., 724, 664.

11 Mo. Rep., 595; 16 Ohio Rep., 66.

8 Mo. Rep., 94.

Under the statute of Arkansas, the patent certificate is of equal grade and dignity with the patent itself.

Rev. Stat. of Ark., p. 344, ch. 53, secs. 1 and 2.

McClairen v. Wicker, 8 Ark. Rep., 195.

Penn v. O'Hanlon, 11 Mo. Rep., 595.

Morton v. Blankenship, 5 Ib. Rep., 356.

Burner v. Marlow, 1 Scum. (Ill.) Rep., 162.

James v. Steel, 3 Ib., 99.

239    And is a better title than a patent founded on a subsequent entry, within the meaning of the statute. *239

Pettigrew v. Shirley, 9 Mo. Rep., 688.

5 ib., 350; 11 ib., 595.

The patent could not affect the pre-existing title of the ancestor of the plaintiffs.

N.O. v. Armas, 9 Pet. Rep., 236.

U.S. v. Arredondo, 6 ib., 738.

Catlin v. Jackson, 8 Johns. Rep., 555.

Jackson v. Covey, ib., 388.

Fletcher v. Peck, 2 Cond. Rep., 321.

Nicks v. Rector, 4 Ark. Rep., 283.

And extraneous evidence was admissible to show that the patent was void, for want of authority to issue it.

Polk's Lessee v. Wendell, 3 Cond. Rep., 294.

4 ib., 653.



2 How. U.S. Rep., 317, *et seq.*

Collins *v.* Beaumin, 1 Mo. Rep., 385, (540.)

The title of the plaintiffs related to the date of the pre-emption act, (29th May, 1830.) The making of proof of occupation and cultivation, the adjudication of the right by the land officers, and the payment of the purchase money, were successive steps to perfect the right, and are to be regarded as having been done on that day.

Pettigrew *v.* Shirley, 9 Mo. Rep., 688.

Wynn *v.* Garland, 16 Ark. Rep., 454.

And, consequently, the intervening rights cut out.

Landes *v.* Brant, 10 How. Rep., 372.

12 Mo. Rep., 148; Walker's (Miss.) Rep., 97.

3 Cow. Rep., 75; Viner's Abr., Tit. Relation, 290.

Cruise on Real Property, vol. 5, p. 510, *et seq.*

When the patent was issued, the land had been appropriated, and was not subject to grant; and it ought to have been excluded by the Circuit Court, or the jury instructed to disregard it, as the plaintiffs asked. The act of issuing it was a mere ministerial act, and, as to the rights of the plaintiffs' ancestors, was wholly ineffectual to prejudice them.

Ware *v.* Busk, 1 McLean's Rep., 535.

240  *Mr. Hempstead* treated this point as follows: *240

The first and principal question is, whether a patent issued by the United States can be impeached, annulled, and set aside, in an action at law.

I affirm that a patent is unimpeachable at law, except, perhaps, when it appears on its own face to be void; and the authorities on this point are so uniform and unbroken in the courts, Federal and State, that little else will be necessary beyond a reference to them.

In ejectment, the rule is universal, that the plaintiff must show the right to possession to be in himself positively. It is immaterial, as to his right of recovery, whether it be out of the tenant or not, if it be not in himself; and it follows, a tenant is always at liberty to prove the title out of the plaintiff, although he does not prove it to exist in himself.

Love *v.* Simms, 9 Wheat., 524.

Greenleaf's Lessee *v.* Birth, 6 Pet., 312.

King *v.* Stevens, 18 Ala. 475.

Rupert *v.* Mark, 15 Ill. 540.

1 Blackf., 131; 8 Blackf., 320, 366.



And this grows out of a doctrine, universal in that action, requiring the plaintiff to recover on the strength of his own title, and not allowing him to be successful, on account of the weakness of the title of the defendant, or because he may have none at all.

2 Greenl. Ev., 331.

Marsh *v.* Brooks, 8 How., 233.

In Kentucky, it is a settled principle that courts of law will not look beyond the patent, and it is only in a court of equity that a prior right or equity can be established. The courts of the United States have adopted the same principle.

Finley *v.* Williams, 9 Cranch, 167.

The general rule in Kentucky appears to be, that patents cannot be impeached collaterally by evidence *dehors* the patent. They have the dignity of records. It is true a patent, when it appears on its face to be illegal, may be treated as a nullity, or considered as void; yet, if it appears perfect on its face, it cannot be vacated or annulled by matter *dehors* the patent. It is only by *scire facias*, or other regular mode, that it can be *241 vacated. The reason of the distinction is evident. The Commonwealth cannot be divested of her title but by matter of record; and when she has so divested herself, she cannot regularly reinvest herself of the title but by matter of record. If a patent be illegal upon its face, it is itself record evidence of the matter which renders it a nullity; but if it be legal and perfect upon its face, it is a record of the title having passed to the grantee, and it cannot regularly be defeated but by matter of as high a nature.

Bledsoe's Devisees *v.* Wells., 4 Bibb, 329.

The same doctrine will be found explicitly recognised in Virginia, in Alexander *v.* Greenup, 1 Munf., 134.

It is fully supported by the English authorities.

5 Com. Dig., F. 1, F. 4, F. 6, F. 7, title Patent

2 Bl. Com., 346.

A patent is a record of high dignity. It issues under the great seal, is enrolled, and the proceeding to vacate or annul it must emanate from chancery, and may be set on foot by the Government, or any one prejudiced.

5 Com. Dig. Patent, F. 6, p. 357.

2 Com. Dig. Chancery, C. 1, p. 366.

Taylor *v.* Fletcher, 7 B. Monroe, 81.

There are certain exceptions to this rule, which may go far towards reconciling contradictory cases:

1. Where the Legislature has declared that the patent shall be void, if issued in contravention of a described state of case.

2. Where the Legislature has declared that the patent shall be deemed fraudulent, if issued under similar circumstances.

Taylor *v.* Fletcher, 7 B. Monroe, 83.

Ray *v.* Barker, 1 B. Monroe, 368.



Dallam *v.* Handley, 2 A.K. Marsh., 418.

Atchley *v.* Latham, 2 Litt., 362.

Jennings *v.* Whittaker, 4 B. Monroe, 51.

Pearson *v.* Baker, 4 Dana, 322.

Cain *v.* Flynn, 4 Dana, 501.

Sutton *v.* Mencer, 6 B. Monroe. 438.

Little *v.* Bishop, 9 B. Monroe, 246.

242 A patent cannot be declared void at law, because the patentee *242 failed to give one in actual possession the three months' notice required by the act of 1831, (2 Stat. Law, 1037;) but the settlers' rights under the act may be enforced in chancery.

Pearson *v.* Baker, 4 Dana, 321.

A party cannot travel behind a patent to avoid it.

4 Monroe, 51.

A patent, when attacked incidentally, cannot be declared void, unless it be procured by actual fraud, or is void on its face, or has been declared void by law.

Underwood *v.* Crutcher, 7 J.J. Marsh., 532.

A patent cannot be avoided at law in a collateral proceeding, by matters *dehors* the patent, unless it is declared void by statute, or its nullity indicated by some equally explicit statutory denunciation.

4 Bibb, 330; 4 Mon., 51; 4 Dana, 322.

In Pennsylvania, where there are no courts of chancery, an action of ejectment may be sustained on an equitable title; but the rule always has been there, in the courts of the United States, that the plaintiff must show a paramount legal title.

2 Wn. C.C.R., 35.

12 Peters, 23.

Although State courts cannot interfere with the primary disposal of the public land, yet, if one obtain a legal title from the United States improperly, and to the prejudice of a prior right, equity will relieve and hold him as a trustee.

Groves's Heirs *v.* Fulsome, 16 Miss., 544.

Huntsucker *v.* Clark, 12 Miss., 337.

Stephenson *v.* Smith, 7 Miss., 610.

Gaines *v.* Hale, 16 Ark. 25.



It is only where letters patent are void on their face, as being issued contrary to law, or where the grant is of an estate contrary to law, as against the prohibition of a statute, that it possibly may be held void in a collateral proceeding.

Jackson *v.* Marsh., 6 Cowen, 282.

Jackson *v.* Lawton, 10 Johns., 23.

Parmlee *v.* Oswego Co., 7 Barb., 622.

The People *v.* Livingston, 8 Barb., 278, 284, 285, 286; 287, 295.

243  *243

Jackson *v.* Hart, 12 Johns., 77.

People *v.* Mauran, 5 Denio, 389, 398, 400.

A patent must prevail in a trial at law, unless it is in fact a *felo de se* — unless it carries on its own face the evidence of a nullity. One perfect on its face is not to be avoided, in a trial at law, by anything short of an elder patent. It is not to be affected by evidence or circumstances which might show that, in a court of equity, the party offering impeaching evidence would probably prevail. The jurisdictions of the two tribunals must be kept distinct, and the patent must prevail at law, although it may be made to yield to the superior right of the adverse party in another forum. In the case of an actual and perfect patent, there is no remedy but to set it aside in a court of equity, or in some direct proceeding having that for its direct end and object. It cannot be done in the ordinary progress of a trial at law, on evidence which the party had no means to know would be relied on, and therefore could not be prepared to meet. In other words, you cannot go behind a patent in a trial at law. The patent alone must prevail.

The principle interdicting the introduction of extrinsic evidence to impeach a patent free from objection on its face, does not depend on the grade or nature of the evidence.

Norvell *v.* Camm, 6 Munf., 233, 238.

Witherington *v.* McDonald, 1 Hen. and Munf., 303.

Alexander *v.* Greenup, 1 Munf., 140.

The same doctrine was laid down by Marshall, C.J., in Stringer *v.* Lessee of Young, 3 Peters, 340. He said no case had shown that a patent may be impeached at law, unless it be for fraud — not legal and technical, but actual and positive fraud, in fact, committed by the person who obtained it; and even that, said he, is questioned, citing the above case of Witherington *v.* McDonald, 1 H. and M., 306; also Hoofnagle *v.* Anderson, 7 Wheat., 212; Boardman *v.* Reed, 6 Pet., 342; 6 Cranch, 131; 8 How., 233; Patterson *v.* Winn, 11 Wheat., 380. The opinion of the Chief Justice evidently was, that a patent could not be impeached at law, even for fraud — actual, positive fraud. It has been said, a patent is void and confers no title when it issues for land that has been previously patented *244 to another individual, or granted to him by act of Congress, which is equivalent to a patent.

244

Stoddard *v.* Chambers, 2 How., 318.

Grignon *v.* Astor, ib., 344.



Why is this so? Why, under such circumstances, may a patent be held inoperative at law? Those cases themselves answer — because the fee has passed out of the United States, and vested in the first patentee or grantee.

18 How., 88; 9 Cranch, 99.

Those cases do not warrant, nor are there any cases to be found in the courts of the United States which warrant, the impeachment of a patent, at law, in a case where a pre-emptioner claims in opposition to that patent. Resort must be had to a court of equity, and to that alone.

An elder equitable right may be investigated, and asserted in chancery against a patent, but this cannot be done at law. This court, says McLEAN, J., (6 Peters, 342,) have repeatedly decided that, at law, no facts behind the patent can be investigated.

A patent is a better legal title than an entry with the register and receiver, and in an action of ejectment must prevail over it.

Gaines v. Hale, 16 Ark. 25.

Griffith v. Deerfelt, 17 Miss., 31.

Dickinson v. Brown, 9 S. and M., 130.

Bruckner v. Lawrence, 1 Doug. (Mich.,) 37.

Bagnell v. Broderick, 13 Peters, 436.

Wilcox v. Jackson, 13 Peters, 516.

Wiggins v. Lusk, 12 Ill. 132.

A patent is evidence, in a court of law, of the regularity of all previous steps to it, and no facts behind it can be investigated.

6 Peters, 724; 5 Wheat., 293.

7 Wheat., 151; 11 Wheat., 580; 4 Peters, 340.

In actions at law, the legal title must prevail, and there can be no inquiry into the equities of the parties. They must be ascertained and adjusted in a court of equity. Where land is purchased in the name of one person, with 245 the funds of another, *245 the legal estate is vested in the former. The latter acquires only an equitable estate, and he must resort to a court of equity to enforce it, and cannot assert it in an action of ejectment.

Phelps v. Kellogg, 15 Ill. R., 136.

No equitable title can be set up in ejectment, in opposition to the legal estate.

Jackson v. Chase, 2 Johns., 84.

Jackson v. Pierce, ib., 222.

To recover in ejectment, the plaintiff must show a paramount legal title.

Swayze v. Burke, 12 Peters, 23.

A patent is conclusive in a court of law.

West *v.* Cochran, 17 How., 403.

14 How., 382; 15 How., 450.

The legal title must prevail at law.

13 How., 24; 11 How., 568.

9 How., 171; 8 How., 365.

A plaintiff must recover upon the strength of his title, and that must be a legal as contradistinguished from an equitable title.

Livingston *v.* Story, 9 Peters, 632.

United States *v.* King, 7 How., 846.

Gilmer *v.* Poindexter, 10 How., 297.

The fee remains in the United States until the issuing of the patent, and it must be so considered at law, although in equity the holder of the patent certificate of the register is held to be the owner.

Carroll *v.* Safford, 3 How., 460, 461.

Fraud, which goes to the question, whether the instrument ever had any legal existence, may be admitted in a court of law. But, otherwise, chancery is the proper forum.

Hartshorn *v.* Day, 19 How., 211, 223.

A patent cannot be collaterally avoided at law, even for fraud.

Field *v.* Seabury, 19 How., 324, 332.

246 This case is conclusive on the subject, and it was said that the case in 2 How. S.C.R., 318, did not authorize the impeachment *246 of a patent at law. Courts of justice have no authority to disregard surveys and patents, when dealing with them in actions of ejectment.

West *v.* Cochran, 17 How., 403.

Willet *v.* Sandford, 19 How., 82.

The Legislature of Arkansas has provided that an action of ejectment may be maintained on an entry made with the register and receiver of the proper land office of the United States, or on a pre-emption right under the laws of the United States.

Digest, 454.

But a patent, being a superior legal title, must, of course, prevail over them; nor would it be competent for any State legislation to give such titles, which are only of an equitable nature, precedence over the legal title.

Wilcox *v.* Jackson, 13 Peters, 516.

Irvine *v.* Marshall, 20 How., 566.



Bagnell *v.* Broderick, 13 Peters, 450, 451.

And although actions of ejectment may be maintained on an equitable title, or less than a complete legal title, in the State courts, by virtue of positive legislation, yet it may admit of great doubt, whether, in the courts of the United States, that action can be sustained on anything but the paramount legal title. Such I understand to have been decided.

In Carson's Lessee *v.* Boudinot, 2 Wn. C.C.R. 33, Judge Washington so held, although, there being no courts of chancery in Pennsylvania, the State courts allow a recovery in ejectment on an equitable title.

And, also, in Swayze *v.* Burke, 12 Peters, 23, also from Pennsylvania, it was held by this court, Justice McLEAN delivering the opinion, that, "as there is no court of chancery under the laws of Pennsylvania, an action of ejectment is sustained on an equitable title by the courts of that State. Such is not the practice in the courts of the United States; and in this case," says he, "if the plaintiffs fail to show a para mount legal title in themselves, they cannot recover."

Certainly the action never can be maintained against the superior title — certainly the dignity of a patent can 247 never be *247 imparted to the certificate of purchase; or, to what is a title of inferior grade, a pre-emption right.

Bagnell *v.* Broderick, 13 Peters, 450.

What security would there be in titles, if, in actions at law, juries should undertake to pronounce on the validity of patents — undertake to say whether they rightfully or wrongfully issued — or whether the officers of Government had proceeded according to law, and, if not in a collateral proceeding, a trial at *nisi prius,* annul the highest and most solemn titles emanating from Government? Here is a patent from the United States, regularly issued, under the great seal, signed by the President, and having passed through all the formalities requisite to make it the highest and most perfect evidence of title that can possibly exist, under any Government — regular and formal on its face — and the proposition is, that a jury, ignorant of law and legal proceedings — composed, it may be, of persons not fit to try a six-bit case — are to pronounce upon its validity, and avoid it, if they please. What they might think to be fraud, might be no fraud at all; there might be ample power in the officer to issue it, and yet the jury might think otherwise. One jury might set aside a patent — another jury sustain it; and so, what ought to be the highest evidence of right, is something, or nothing, according to the whim, caprice, intelligence, or ignorance, of the jury. The whole thing is absurd; everybody sees it; and such a doctrine ought to receive no countenance whatever. If a patent issued, in many cases, after a long contest, and against vehement opposition, as this was issued, is not to import absolute verity at law, the issuing of patents ought to cease altogether; as they would only delude the purchaser; if, indeed, the disappointed contestant, in each case, could, the next day, in effect, take an appeal from a solemn act of Government to a jury, and reinvestigate the whole matter, and have the patent avoided at law. A claimant, disappointed in obtaining a patent himself, and his adversary having got it, forthwith brings an action of ejectment, and transfers the question to a jury, and reopens it again, with a view of having the patent annulled; in a forum where no issue 248 can be made upon it, nor parties in interest *248 brought before the court. I say again, the whole thing is absurd. If a patent is to be impeached or annulled, it can only be done by a direct proceeding in chancery for that purpose, and where all parties in interest can be brought, and their respective rights ascertained and protected. And to that forum these claimants resorted; and, after full investigation, the pre-emption claim was declared fraudulent, and the patent to be good; and they then commenced again at law to retry that question, and want to have a jury decide it, when they have failed in the proper tribunal. I have no idea parties can be successful in the attempt to commit such legal outrages.



The instructions given on that point are sustained by both principle and authority, and nothing further need be said to demonstrate their correctness.

2. The right forum to impeach the patent was a court of chancery, and that had been resorted to, and the pre-emption claim of Cloyes declared invalid, and to be in fact a base fraud, as the proof in the chancery case conclusively showed it was.

Lytle et al. *v.* the State et al., 17 Ark. 608. See transcript in this court, No. 123.

It was purely vexatious to bring this ejectment suit, and the plaintiffs had no right to do it, as the same matter was involved in their chancery suit.

Mason *v.* Chambers, 4 J.J. Marsh., 401

THIS case was brought up by writ of error from the Circuit Court of the United States for the eastern district of Arkansas.

It was an ejectment brought by the Hoopers against Scheimer, for an undivided one-fourth part of lots numbered one, two, three, four, five, six, seven, eight, nine, ten, eleven, and twelve, in block numbered ten, in that part of the city of Little Rock lying east of the Quapaw line, and known as Governor Pope's addition; and are embraced in the northwest fractional quarter of section number two, in township one north, range twelve west.

The plea was, not guilty, c., and upon the trial of the issue by a jury, a verdict for the defendant was returned, and he had judgment for costs.

The mode of bringing an ejectment in Arkansas is merely to state in the declaration that the plaintiff was entitled to the possession of the property, and that the defendant entered upon it and ejected the plaintiff therefrom.

The Hoopers were the heirs of Cloyes, and claimed under his pre-emption, which has been mentioned more than once in these reports.

The defendant claimed under a patent embracing the lots in controversy, to the reading of which in evidence the plaintiffs objected, on the ground that it was inoperative and void as to the said northwest fractional quarter on which said pre-emption had been established, because said fractional quarter had been previously appropriated to the private use of said Nathan Cloyes, deceased, and that such patent had been issued without authority, in violation and without warrant of law, and for land not subject to be granted or patented; but the court overruled the objection, and permitted the patent to be read; whereupon the plaintiffs excepted.

There was other evidence on both sides given upon the trial, but it is not necessary to mention it in this report.

237   After the evidence was finished, the plaintiffs offered two *237 prayers to the court, the purport of which was to declare the patent inoperative and void; which prayers were refused. The defendant offered five which were granted, of which it is only necessary, in this report, to notice the two following.

1. The patent from the United States, conveying the fee to the northwest fractional quarter of section two, in township one north, of range twelve west, to the grantee therein named, dated 2d November, 1833, not appearing to be void, is a complete and paramount legal title, and must prevail in this action over the title of the plaintiffs, and any equities that may exist between parties behind it can only be assisted and be made available



in a court of chancery, but cannot affect the patent in this action; and if the jury believe that the undivided interest mentioned in the declaration is embraced in the patent as a portion of the said tract of land, the finding of the jury should be for the defendant.

2. That the action of ejectment is founded on the legal title, and the plaintiffs must recover on the strength of their own title; that a patent from the United States is a higher and better legal title, and must prevail, in an action of ejectment, over an entry with the register and receiver or a pre-emption right under the laws of the United States, notwithstanding the State statute may authorize an action of ejectment to be instituted on the latter, and maintained against any person not holding under a superior title.

Mr. Justice CATRON delivered the opinion of the court.

An action of ejectment was brought in the Circuit Court of the United States for eastern district of Arkansas, founded on an entry made in a United States land office. This was the only title produced on the trial by the plaintiffs.

The defendant held possession under a patent from the United States to John Pope, (Governor, c.,) with which the defendant connected himself by a regular chain of conveyances. The Circuit Court held the patent to be the better legal title, and so instructed the jury, who found for the defendant; and the plaintiffs prosecute this writ of 249 error to reverse that judgment. *249

By the statute of Arkansas, an action of ejectment may be maintained where the plaintiff claims possession by virtue of an entry made with the register and receiver of the proper land office of the United States. Ar. Digest, 454.

This court held, in the case of Bagnell et al. v. Broderick, (13 Peters, 450,) "that Congress had the sole power to declare the dignity and effect of a patent issuing from the United States; that a patent carries the fee, and is the best title known to a court of law." Such is the settled doctrine of this court.

But there is another question, standing in advance of the foregoing, to wit: Can an action of ejectment be maintained in the Federal courts against a defendant in possession, on an entry made with the register and receiver?

It is also the settled doctrine of this court, that no action of ejectment will lie on such an equitable title, notwithstanding a State Legislature may have provided otherwise by statute. The law is only binding on the State courts, and has no force in the Circuit Courts of the Union. Fenn v. Holme, (21 How., 482.)

It is ordered, that the judgment be affirmed.

No. 60 depends on the same titles and facts and instructions to the jury as are set forth in 59; and the same verdict and judgment were given in the Circuit Court.

We order it to be affirmed likewise.



provisions governing the issuance of new rights of way
were repealed by the Federal Land Policy and Manage-
ment Act, §706(a), 90 Stat. 2793. This case requires us to
define the nature of the interest granted by the 1875 Act,
in order to determine what happens when a railroad
abandons its right of way.

### B

Melvin M. Brandt began working at a sawmill in Fox
Park, Wyoming, in 1939. He later purchased the sawmill
and, in 1946, moved his family to Fox Park. Melvin's son
Marvin started working at the sawmill in 1958 and came
to own and operate it in 1976 until it closed, 15 years
later.

In 1976, the United States patented an 83-acre parcel of
land in Fox Park, surrounded by the Medicine Bow-Routt
National Forest, to Melvin and Lulu Brandt. (A land
patent is an official document reflecting a grant by a
sovereign that is made public, or "patent.") The patent
conveyed to the Brandts fee simple title to the land "with
all the rights, privileges, immunities, and appurtenances,
of whatsoever nature, thereunto belonging, unto said
claimants, their successors and assigns, forever." App. to
Pet. for Cert. 76. But the patent did include limited excep-
tions and reservations. For example, the patent "except[s]
and reserv[es] to the United States from the land granted
a right-of-way thereon for ditches or canals constructed
by the authority of the United States"; "reserv[es] to the
United States . . . a right-of-way for the existing Platte
Access Road No. 512"; and "reserv[es] to the United States
. . . a right-of-way for the existing Dry Park Road No. 517."
*Id.,* at 76–77 (capitalization omitted). But if those roads
cease to be used by the United States or its assigns for a
period of five years, the patent provides that "the ease-
ment traversed thereby shall terminate." *Id.,* at 78.

Most relevant to this case, the patent concludes by

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ESTATE OF JOHN BAMBERG and KEM T.
BAMBERG,

     Plaintiffs,

v.

REGIONS BANK, d/b/a REGIONS
MORTGAGE, REGIONS FINANCIAL
CORP., GEHEREN FIRM PC, KEY
PROPERTY SERVICES, LLC, and SRP
SUB, LLC,

     Defendants.

CIVIL ACTION NO.

1:14-cv-01960-JEC

## ORDER & OPINION

This case is before the Court on plaintiffs' Motion for a Temporary Restraining Order [4]. The Court has reviewed the record and plaintiffs' arguments and, for the reasons set out below, concludes that plaintiffs' Motion for a Temporary Restraining Order [4] should be **DENIED**.

## BACKGROUND

This action arises out of a dispossessory proceeding filed in Henry County Magistrate Court. (Mot. for TRO [4] at 1.) This current filing represents plaintiffs' third effort to utilize the federal court system to stop their eviction from residential property that has previously been foreclosed. Specifically, on January 27, 2014, the Bamberg parties, consisting of the Estate of John Bamberg and Kem Bamberg ("the Bambergs"), removed to federal court a

Dockets.Justia.com

dispossessory action filed against them in the Magistrate Court of Henry County. The plaintiff in that case, Key Property Services, sought possession of the residential property at issue, apparently because of non-payment of rent by the Bambergs.[1] *See Key Prop. Servs. v. Bamberg*, Civ. Action No. 1:14-cv-00238-JEC-GGB, Order & Final Report & Recommendation [Dkt. 3] (N.D. Ga. Mar. 3, 2014)(Brill, Mag. J.).

The magistrate judge recommended a remand of the action back to Henry County because the Bambergs had failed to show the existence of any federal jurisdiction in that case. That is, there was no federal question jurisdiction over this garden-variety eviction action. As to diversity jurisdiction, the magistrate judge concluded that both Kem Bamberg and the defendant, Key Property Services, are citizens of the State of Georgia, meaning that there was no diversity of citizenship. Second, the Bambergs had failed to show that the amount in controversy exceeded $75,000, which is a second requirement for

---

[1]    Defendant Key Property Services instituted dispossessory proceedings in the Henry County Magistrate Court on October 22, 2013. *Key Prop. Servs. v. Bamberg & All Other Occupants*, Case No. 2013-4804-CB (Henry Cnty. Mag. Ct. Oct. 22, 2013). (Henry Cnty. Mag. Ct. Oct. 22, 2013), *available at* https://hcwebb.boca.co.henry.ga.us/cm websearchppp/CaseView.aspx?norec=1 (last accessed June 30, 2014). Plaintiffs do not expand on this point in their filings, but it appears that Kem T. Bamberg became a tenant of Key Property Services after the foreclosure sale and had not paid rent from September 3, 2013 to January 31, 2014. *Id.* at Mot. to Compel Payment of Rent Into the Registry of the Ct. (Jan. 2, 2014).

2

AO 72A

diversity jurisdiction, as the back rent being sought did not exceed that amount and as possession of premises has no inherent monetary value. (*Id.* at 2-4.)

This Court issued an Order adopting the magistrate judge's Report and Recommendation and the case was remanded on March 24, 2014. Notwithstanding this ruling, three weeks later, on April 15, 2014, the Bambergs once again removed this very same state-court dispossessory action back to federal court. *See Key Prop. Servs. v. Bamberg*, Civ. Action No. 1:14-cv-01107-JEC-GGB, Order & Final Report & Recommendation [Dkt. 4] (N.D. Ga. Apr. 17, 2014)(Brill, Mag. J.). Not surprisingly, as there were no new facts or legal justification for the removal, the magistrate judge once again recommended remand. *Id.* On this occasion, Key Property asked that the Court award attorneys' fees and costs, given the Bambergs' obviously futile removal of an action that had just been remanded less than three weeks before. *Id.* at [Dkt. 2].

This Court adopted the Order of the magistrate judge recommending remand, but did not require the Bambergs to pay attorney's fees and costs. (*Id.* at Dkt. 8.) Following issuance of this Order, on June 18, 2014, this case was once again remanded to Henry County Magistrate Court.

Undaunted, less than one week later, the Bambergs are now back

3

in federal court, once again seeking to have this Court enjoin the Henry County Magistrate Court from finalizing this dispossessory action and to enjoin the defendants from evicting the Bambergs. That is, on June 23, 2014, the Bambergs filed this present action against Key Property Services and a variety of other entities. The next day, June 24, 2013, the Henry County Magistrate Court granted SRP Sub a Dispossessory Judgment and Order, awarding it a writ of possession to the Johnson Court property as of July 1, 2014. (Appl. [1] at Mot. for TRO, at Ex. A.) That same day, plaintiffs filed their motion for a temporary restraining order, again asking this Court to enter an emergency injunctive order enjoining any and all from ejecting the Bambergs from the property. (*Id.* at Mot. for TRO, at 1-2.)

## DISCUSSION

### I. JURISDICTION

This case is initially before the Court to determine whether the plaintiffs are entitled to proceed *in forma pauperis*, as they have again requested to do. The federal *in forma pauperis* statute ensures that indigent litigants have access to federal courts. 28 U.S.C. § 1915 (2014); *Neitzke v. Williams*, 490 U.S. 319, 324 (1989)(citing *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 342-43 (1948)). Because a litigant proceeding *in forma pauperis* "lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive

4

lawsuits", § 1915 permits the Court to dismiss the action upon determining that it is frivolous or malicious, fails to state a claim for relief, or seeks relief from a party that is immune from such claims. *Neitzke*, 490 U.S. at 324; 28 U.S.C. § 1915(e)(2)(B); *see also Wilson v. Smith*, ___ Fed. App'x ___, 2014 WL 2118716, at *1 (11th Cir. 2014).

As with any other action, it is the Court's obligation to confirm that it possesses subject matter jurisdiction over the plaintiff's claims. *See Walker v. Sun Trust Bank of Thomasville, Ga.*, 363 Fed. App'x 11, 15 (11th Cir. 2010) and *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)(stating that courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.") Obviously, if the court lacks jurisdiction, the plaintiffs' complaint will be deemed frivolous and *in forma pauperis* status will not be conferred.

Not surprisingly—having previously ruled twice before that there is no subject matter jurisdiction—the Court does so again and directs that this case be dismissed on that ground. *See Davis v. Ryan Oaks Apartment*, 357 Fed. App'x 237, 238-39 (11th Cir. 2009). A party who invokes the court's jurisdiction has the burden of establishing that it is proper. *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1216 (11th Cir. 2007). Plaintiffs, once again, have failed to

5

do so.

First, diversity jurisdiction is not available. 28 U.S.C. § 1332(a)(1) (2014). The latter statute requires *complete* diversity of parties; "every plaintiff must be diverse from every defendant." *Id.*; *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). Both plaintiff Bamberg and defendant Gehren Firm PC are citizens of Georgia, so complete diversity does not exist here. (*See* Compl. [3] at 2-3, 5, Exs. A(9), B.)

Second, plaintiffs have failed to show the existence of federal question jurisdiction. 28 U.S.C. § 1331 (2014). While plaintiffs' complaint and motion are littered with citations to the Constitution, federal treaties, and 18 U.S.C. § 242 (1996), their causes of action all ultimately relate to a claim akin to wrongful foreclosure and eviction. Indeed, plaintiffs pray for damages for gross negligence, damages for emotional distress resulting from illegal threats, injunctive and declaratory relief, to quiet title pursuant to O.C.G.A § 23-3-60, -61 (1966), to void the debt supposedly due under the home mortgage loan, and damages for emotional distress resulting from Bamberg's July 1, 2013 bankruptcy filing. (Compl. [3] at 12.) The references to federal law, treaties, and the Constitution do not supply federal question jurisdiction, but simply reflect plaintiffs; assertion that their interest in the Johnson Court property traces back to the Georgia Land Lotteries of 1821. (*See, e.g.*, Compl. [3]

6

at 3-11 and Mot. for TRO [4] at 2-5.)

Yet, plaintiffs' causes of action are not created by federal law, nor does their alleged right to relief "'depend[] upon the construction or application of federal law'", let alone "a substantial [contested federal issue], indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum". *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986); *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313 (2005)(quoting *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921) and describing jurisdiction over federal issues intertwined with state law claims). Thus, consideration of plaintiffs' complaint and motion does not require the Court to resolve a disputed question of federal law.

Further, "a federal court may dismiss a federal question claim for lack of subject matter jurisdiction [] if (1) 'the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction'; *or* (2) 'such a claim is wholly insubstantial and frivolous.'" *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1352 (11th Cir. 1998)(quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)(emphasis in original)). Even when charitably construed, plaintiffs' citations to the Contract Clause of the United States

7

Constitution, 18 U.S.C. § 242, and "Gross Negligence of Constitutional Right against the Laws of the Land" clearly meet this standard, as no state actor is present and plaintiffs do not allege any entanglement with such or action taken under color of state law by defendants.[2] (Compl. [3] at 8, 12.) Similarly, plaintiffs' prayer for damages in the form of $10 million in gold coin for violations of "Treaty Law, The Georgia Constitution, [and] Laws of the Land" is patently insubstantial and frivolous.

For these reasons, plaintiffs' action does not arise under the Constitution, laws, or treaties of the United States, and federal question jurisdiction is improper. Thus, the Court does not have jurisdiction over plaintiffs' action, meaning that the action is frivolous under § 1915 and further that the action must be dismissed.

## II. PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Even assuming that the Court has jurisdiction over plaintiffs' action, plaintiff has made no showing to support the issuance of injunctive relief.

### A. Standard for a TRO

Upon motion, district courts may issue temporary restraining orders only if

---

[2] Plaintiffs' paragraph regarding § 242 does not make any factual allegations, but merely describes the conduct made illegal by the statute. (Compl. [3] at 8.)

8

> specific facts in an affidavit or a verified complaint
> clearly show that immediate and irreparable injury, loss,
> or damage will result to the movant before the adverse
> party can be heard in opposition; and the movant []
> certifies in writing any efforts made to give notice and
> the reasons why it should not be required.

FED. R. CIV. P. 65(b)(1) (2014). More specifically, the Eleventh Circuit requires that the party seeking a temporary restraining order show that "(a) there is a substantial likelihood of success on the merits; (b) the TRO [] is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO [] would cause to the non-movant; and (d) the TRO [] would not be averse to the public interest." *Parker v. St. Bd. Of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001).

**B.** **Plaintiffs' Request for a Temporary Restraining Order Violates the *Rooker-Feldman* Doctrine and the Anti-Injunction Act**

Plaintiffs' request for a temporary restraining order seeks to enjoin defendants from taking possession of the Johnson Court property pursuant to an order from the Henry County Magistrate Court. The magistrate issued his order after speaking with Bamberg and hearing the testimony of the parties. *Key Prop. Servs.*, Case No. 2013-4804-CB, at Notice Printed (June 19, 2014), Calendar (June 24, 2014); (Mot. for TRO [4] at Ex. A). Further, the order is now appealable. (Mot. for TRO [4] at Ex. A.) Thus, the Court cannot review it. *See Christophe v. Morris*, 198 Fed. App'x 818, 825 (11th

9

Cir. 2006)("To the extent that Christophe's complaint was construed as a challenge to the state court's ruling that she violated her lease, and, therefore, that the landlord was legally permitted to an order of dispossession, the district court properly dismissed the complaint under the *Rooker-Feldman* doctrine[.]") and *Ware v. Polk Cnty. Bd. Of Cnty. Com'rs*, 394 Fed. App'x 606, 608-09 (11th Cir. 2010).

Moreover, insofar as plaintiff's complaint seeks an order granting an "[i]mmediate 'Stay of Mandate' from any lower court pursuing litigation in this matter", an "[i]mmediate 'Stay' of all proceedings to include lower courts in the State of Georgia", or otherwise enjoining proceedings previously initiated in Henry County or any other state court, the Court cannot grant such relief because it would violate the Anti-Injunction Act and does not fall under any of the three accepted exceptions. (Compl. [3] at 12, Mot. for TRO, at 7); 28 U.S.C. § 2283 (1948); *see Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286-87 (1970) and *Peterson v. MersCorp Holdings, Inc.*, Civ. Action No. 1:12-cv-00014-JEC, 2012 WL 3961211, at *9 (N.D. Ga. Sept. 10, 2012)(Carnes, C.J.).

C. **Plaintiffs Have Failed to Show a Likelihood of Success on the Merits**

In any case, plaintiffs' request for a temporary restraining order fails because they have not shown any likelihood of success on

10

the merits. Plaintiffs' motion mostly consists of string cites to treaties and case law from the early and mid-1800's. (Mot. for TRO [4] at 2-5.) Besides a section describing the inapplicable standard for obtaining a temporary restraining order or preliminary injunction under Georgia law, (*id.*), the only paragraph of any substance in plaintiffs' motion states that "[p]laintiff has made a showing that without an Emergency Order granting a Temporary Restraining Order or Preliminary Injunction, [p]laintiff will be irreparably harmed", (*id.*), and that "[p]laintiff (sic) petition is Verified, [p]laintiff (sic) has shown the Court that they are the true legal owners of this Land Grant/Patent." (*Id.*)

Even when considered in light of the more lenient standard to which *pro se* filings are held, these conclusory statements do not satisfy the heavy burden of showing likelihood of success on the merits that plaintiffs must meet to obtain the extraordinary and drastic remedy of a temporary restraining order. *Bolden v. Odum*, 695 F.2d 549, 550 (11th Cir. 1983)(discussing *pro se* pleadings); *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (discussing preliminary injunctions); *see Matveychuk v. One W. Bank, FSB*, Civ. Action No. 1:13-cv-3464-AT, 2013 WL 6871981, *4 (N.D. Ga. Dec. 19, 2013)(Totenburg, J.)(denying TRO for failure to show likelihood of success on the merits) and *Peterson*, 2012 WL 3961211 at

11

9 (same).

## CONCLUSION

Because the Court does not have jurisdiction over plaintiffs' action, the Clerk of Court is ordered to **DISMISS** and **CLOSE** this case. FED. R. CIV. P. 12(h)(3) (2014); *Herskowitz v. Reid*, 187 Fed. App'x 911, 912-13 (11th Cir. 2006). Even if the Court had jurisdiction, it would, once again, deny plaintiffs' Motion for a Temporary Restraining Order [4].

Further, this action marks the third occasion on which Bamberg is before the Court *in forma pauperis* regarding the Johnson Court property. And for the third time the Court has found her claims to be without merit. For this reason, the initiation of any further actions by Bamberg with respect to the Johnson Court property must be accompanied by the payment of filing fees. Should the Bambergs refile an action concerning this property and again request IFP status, they will have disobeyed an order of the Court and be subject to an Order of contempt of court, with the possibility of subtantial fines. Further, should the plaintiffs again attempt to file in federal court an action concerning this property and should the named defendants expend resources defending that action, plaintiffs will be ordered to pay attorney's fees and costs.

The Clerk is directed to close this action.

12

SO ORDERED, this 30th day of June, 2014.

/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

AO 72A

# EXHIBIT E

*Bamberg Family Irrevocable trust*
*n49 Johnson Court*
*Stockbridge, GA 30281*

# STATE OF GEORGIA

GEORGIA, HENRY COUNTY
I CERTIFY THAT THE FOREGOING
IS A TRUE AND EXACT COPY OF THE
ORIGINAL WHICH APPEARS OF RECORD
IN THIS OFFICE. BK   13588
PG   321-332
IN WITNESS WHEREOF I HAVE
THIS   3   DAY OF  June 2014
AFFIXED MY SEAL AND SIGNATURE
BARBARA A. HARRISON - HENRY SUPERIOR COURT



Doc ID: 016772000012 Type: MISC
Recorded: 05/30/2014 at 10:30:44 AM
Fee Amt: $52.00 Page 1 of 12
Henry, GA Clerk of Superior Court
Barbara Harrison Clerk of Court
BK 13588 PG 321-332

---

### The Georgia Archives, University System of Georgia

I, *Christopher M. Davidson, J.D., Director of The Georgia Archives, do hereby certify that the one page document hereto attached and made part of this certificate is a true and correct copy of page 52 of 1821 Land Lottery Henry County Register of Grants, showing Henry County, District 12, Land Lot 28, and I further certify that the described grant book is on file and of official record in the Archives of the State of Georgia.*

*IN TESTIMONY WHEREOF, I have set my hand and affixed the Official Seal of the State of Georgia this twenty-ninth day of April, 2014*

*Director, The Georgia Archives*







# STATE OF GEOR[GIA]

By His Excellency [...]

Commander in Chief [...]

and of the Militia thereof. [...]

TO ALL TO WHOM THESE [...]

KNOW YE, That in pursuance of [...]

bly, passed the 15th of May, 1821, for [...]
the Creek Nation of Indians, and forming the [...]
ette, and Henry, in this State, I HAVE GIVEN AND [...]
ents, in the name and behalf of this State, DO GIVE [...]
*Solomon Robertson of [...]*
*Hancock County his* ——
heirs and assigns forever, all that Tract or Lot of Land, [...]
a half acres, situate, lying, and being in the *Twelfth* [...]
District of *Henry* ——— county, in the said Sta[te]
Tract or Lot of Land is known and distinguished in the pla[n] [...]
ber *twenty eight* ———
form, and marked, as appear by a plat of the same hereunto annex[ed]
hold the said Tract or Lot of Land, together with all [...]
and appurtenances thereof, whatsoever, unto the said [...]
*his* ——— heirs and assigns; to *his* ——— and their p[...]
and behoof forever in fee simple.

GIVEN under my hand and the Great Seal of the State, this [...]
day of *November* in the year of our Lord [...]
*Twenty two* and of the forty *seventh* [...]
Independence.

Signed by His Excellency the Governor, the [...]
6 day of *Nov* 182[...]
*W. C. Lyman* S. E. D.

Registered the *6* day of *November* [...]

A 5



CLKC# 6521PAGE 33
DOC# 061848
FILED IN OFFICE
11/03/2003
04:11:14PM
BK:06521 PG:0033 34
JUDITH G. LEWIS
CLERK OF
SUPERIOR COURT
HENRY COUNTY, GA

Return to: McCain Law Firm
2901-A Piedmont Road
Atlanta, Georgia 30305
File No:03-0640B

GEORGIA, HENRY COUNTY
I CERTIFY THAT THE FOREGOING
IS A TRUE AND EXACT COPY OF THE
ORIGINAL WHICH APPEARS OF RECORD
IN THIS OFFICE IN 6521
PG 33-34
IN WITNESS WHEREOF I HAVE
THIS 21 DAY OF April 2014
AFFIXED MY SEAL AND SIGNATURE

BARBARA A. HARRISON – HENRY SUPERIOR COURT

## QUIT-CLAIM DEED

### STATE OF GEORGIA
### COUNTY OF FULTON

THIS INDENTURE, made this 29th day of September in the year of Two Thousand and Three between Kem T. Bamberg, of the first part, and John Bamberg, of the second part.

WITNESSETH: That the said party of the first part for and in consideration of $1.00, the receipt of which is hereby acknowledged, has bargained, sold and does by these presents bargain, sell, remise, release, and forever quit-claim to the said party of the second part, his heirs and assigns, all the right, title, interest, claim or demand which the said party of the first part has or may have had in and to

See Exhibit "A" attached hereto and made a part hereof.

TO HAVE AND TO HOLD the said described premises unto the said party of the second part his heirs and assigns, so that neither the said party of the first part nor his heirs nor any other person or persons claiming under him shall at any time, claim or demand any right, title or interest to the aforesaid described premises or its appurtenances.

IN WITNESS WHEREOF, the said party of the first part has hereunto set his hand and affixed his seal the day and year above written.
Signed, sealed and delivered in presence of

WITNESS                                  Kem T. Bamberg

NOTARY PUBLIC, State of Georgia, Williford
My Commission Expires

TABITHA
COMMISSION EXPIRES
NOTARY
PUBLIC
JUNE 12, 2007
GWINNETT COUNTY, GEORGIA

REAL ESTATE TRANSFER TAX
HENRY COUNTY
SUPERIOR COURT

NOV 0 3 2003

PAID $
CLERK OF SUPERIOR COURT

Exhibit "A"-6

A

RECORDING REQUESTED BY

WHEN RECORDED MAIL TO:

Bamberg Family Irrevocable Living Land Trust
749 Johnson Court
Stockbridge, GA 30281

# DECLARATION OF ASSIGNEE'S UPDATE OF LAND GRANT

TO WHOMEVER IT MAY CONCERN:

This DECLARATION is directed to be attached to all deeds and/or conveyances in the name of the parties above shown as requesting recording of this document, in a manner known a nunc pro tunc (as it should have been from the beginning).

KNOWN YE ALL MEN THAT BY THESE PRESENTS:  **Kem Bamberg** DO SEVERALLY CERTIFY AND DECLARE THAT I BRING UP THE LAND GRANT IN MY NAME.  THE ASSIGNEE TO THE LAND GRANT THAT IS FILED AND KNOWN AS, THE 4TH GEORGIA LAND LOTTERIES OF 1821:  REGISTERED AS 1821 LAND LOTTERY HENRY COUNTY REGISTER OF GRANTS

SAID COPY OF WHICH IS ATTACHED HERETO.

1.  I, FURTHER CERTIFY THAT I AM THE ASSIGNEE TO A PORTION OF SAID GRANT WHICH IS LEGALLY DESCRIBED AS ATTACHED HERETO AND MADE PART HERETO AND MADE APART HERETO AND MADE APART HEREOF BEING THE ONLY WAY A PERFECT, PARAMOUNT, AND ALLODIAL TITLE CAN BE HAD IN MY NAME, AND PARTICULARLY THE FOLLOWING DESCRIBED LAND SO SOUGHT TO BE GRANTED:

**ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 28 of the 12th District of Henry County, Georgia and being Lot 41, EAGLE RIDGE SUBDIVISION UNIT IV, according to a plat of subdivision recorded in Plat Book 24, Page 264, Henry County, Georgia records, to which reference is hereby made for the purpose of incorporating the same herein.  Said legal description being controlling, however the property is more Commonly known as 749 Johnson Court, Stockbridge, Georgia 30281.**

1

Exhibit A

t

2. NOTICE OF PRE-EMPTIVE RIGHT. PURSUANT TO THE DECLARATION OF INDEPENDENCE(1776), THE TREATY OF PEACE WITH GREAT BRITAIN (8STAT) KNOWN AS THE TREATY OF PARIS [1793] AN ACT OF CONGRESS [3STAT.566, APRIL 24, 1824], THE OREGON TREATY [9STAT.869, JUNE 15, 1846], THE HOMESTEAD ACT [12STAT.392, 1862] AND 43 USC SECTIONS 57, 59, AND 83; THE RECEIPIENT HEREOF IS MANDATED BY ART. VI SECTIONS 1, 2, AND 3; ART. IV SECTIONS I CL. 1&2; SECTION 2 CL. 1 8t 2; SECTION 4; THE 4TH, 7TH, 9TH, AND 10TH AMENDMENTS [U.S. CONSTITUTION, 1781-91] TO ACKNOWLEDGE ASSIGNEE'S UPDATE OF GRANT OR PATENT PROSECUTED BY AUTHORITY OF ART. III SECTION 2 CL. 1&2 ENFORCED BY ORIGINAL/EXCLUSIVE JURISDICTION THEREUNDER AND IT IS THE ONLY WAY TO PERFECT TITLE CAN BE HAD IN MY NAME, WILCOX vs JACKSON, 13 PET. (U.S.) 498, 101. ED 264; ALL QUESTIONS OF FACT DECIDED BY THE GENERAL LAND OFFICE ARE BINDING EVERYWHERE. AND INJUNCTIONS AND MANDAMUS PROCEEDING WILL NOT LIE AGAINST IT, LITCHFIELD vs. THE REGISTER, 9 WALL (U.S.) 575, 19L. ED. 681. THIS DOCUMENT IS INSTRUCTED TO BE ATTACHED TO ALL DEEDS AND/OR CONVEYANCE IN THE NAME OF THE ABOVE PARTY.

3. LAWS OF THE LAND; THIS GRANT IS PROTECTED THROUGH THE CREATION ON THE LAWS OF THE STATE OF GEORGIA OF THE GENERAL ASSEMBLY OF DEC. 1837; THE CONSTITUTION OF THE UNITED STATES; THE CONSTITUION OF THE STATE OF GEORGIA AS AMENDED; HIS EXCELLENCY JOHN CLARK GOVERNOR AND COMMANDER IN CHIEF OF THE ARMY AND NAVY OF THIS STATE, AND OF THE MILITIA THEREOF; AN ACT TO MAKE DISTRIBUTION OF THE LATE CESSION OF LANDS, OBTAINED FROM THE CREEK NATION BY THE UNITED STATES COMMISSIONERS, IN A TREATY ENTERED INTO AT OR NEAR FORT WILKINSON, ON THE 16TH DAY OF JUNE, 1802-APPROVED MAY 11, 1803. VOL II. 100.; AN ACT TO DISPOSE OF AND DISTRIBUTE THE LANDS LATELY ACQUIRED BY THE UNITED STATES FOR THE USE OF GEORGIA, OF THE CREEK NATION OF INDIANS, BY A TREATY MADE AND CONCLUDED AT THE INDIAN SPRINGS, ON THE 8TH DAY OF JANUARY, 1821; AND TO ADD THE RESERVE AT FORT HAWKINS TO THE COUNTY OF JONES APPROVED MAY 15, 1821. VOL IV. 246; THIS EMBRACES THE TERRITORY BETWEEN THE OCMULGEE AND FLINT, ABOVE IRWIN AND BELOW COBB COUNTY.

4. Legal description of HENRY COUNTY

ALL THAT PART OF SAID TERRITORY WHICH LIES EAST OF THE LAST-MENTIONED LINE, AND A LINE COMMENCING AT THE CORNER OF MONROE COUNTY TO THE CHATTAHOOHEE, SHALL FORM ONE OTHER COUNTY TO BE CALLED HENRY.

A1

5. DISCLAIMER; NO CLAIM IS MADE HEREIN THAT I HAVE BEEN ASSIGNED THE ENTIRE TRACT OF LAND AS DESCRIBED IN ORIGINAL GRANT, MY ASSIGNMENT IS INCLUSIVE ONLY TO THE ATTACHED OR ABOVE LISTED LEGAL DESCRIPTION. THE FILING OF THIS DECLARATION OF LAND GRANT SHALL NOT DENY OR INFRINGE ON ANY RIGHT, PRIVILEGE OR IMMUNITY OR ANY OTHER ASSIGNEE TO ANY OTHER PORTION OF LAND COVERED IN THE ABOVE DESCRIBED GRANT.

MEMORANDUM OF LAW ON RIGHTS, PRIVILEGES AND IMMUNITIES

ALLODIAL, FREE; NOT HOLDEN OR ANY LORD OR SUPERIOR; OWNED WITHOUT OBLIGATION OF VASSALAGE OR FEALTY: THE OPPOSITE OF FEUDAL. Baker V. Dayton, 28 Wis. 384; Wallace V. Harmstad, 44 Pa. 499: (Black's Law Dictionary, 4th Edition).

ALLODIUM. LAND HELD ABSOLUTELY IN ONE'S OWN

RIGHT, AND NOT OF ANY SUPERIOR; LAND NOT SUBJECT TO

THE GRANT ALONE PASSES LAND FROM the united States of America TO THE STATE OF GEORGIA TO THE GRANTEE AND NOTHING PASSES A PERFECT TITLE TO PUBLIC LANDS BUT A GRANT/PATENT. Wilcox v. Jackson, 13 Peter (US) 498;

AS ASSIGNEE, WHETHER HE BE THE FIRST, SECOND OR THIRD PARTY TO WHOM THE TITLE IS CONVEYED SHALL LOSE NONE OF THE ORIGINAL RIGHTS PRIVILEGES OR IMMUNITIES OF THE ORIGINAL GRANTEE OF LAND GRANT/PATENT. The U.S. Constitution STATES IN ARTICLE I, SECTION 10, CLAUSE 1, "No state shall ... impair the obligations of contract.";

IMMUNITY FROM COLLATERAL ATTACK: Collins v. Bartlett, 44Cal 371: Webber v. Pere Marquete Boom Co., 62 Mich 626, 30 NW 469: Surgest v. Dow, 24 Miss 118L Pittsmont: Copper Co. v. Vanina, 71 Mont 44 Pac 461 Green v. Barker, 47 Neb 934 66 NW 1032.



Acknowledgment/Jurat

DATE: _May 29,_ _2014_   Signature: Kem Bamberg

Witness _____

STATE OF GEORGIA
COUNTY OF HENRY

On this _29_ day of _May_, _2014_ before me,
_Mike Zabetakis_, personally appeared Kem Bamberg, known to me (or satisfactorily proven) to the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same as Homestead for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal

_Mike Zabetakis_
Notary Public

MIKE ZABETAKIS
Notary Public, Clayton County, GA
My Comm. Expires Aug. 26, 2015

Title (and Rank)
My commission expires _08/26/2015_

| Documents | Grantee Assignee Notice of update of Land Grant, Stapled 4 pages |
|---|---|
| Exhibit A | Original Land Grant from Georgia Division of Archives and History, 4 pages, |
| Exhibit B | Certified Plat, 1 Page, |
| Exhibit C | Certified Warranty Deed, _Quit claim Deed_ |
| Exhibit D | Homestead declaration, 2 pages. |

4

A3

2469
136

BOOK 2469 PAGE 136

GEORGIA HENRY COUNTY

Dec 27   10 09 AM '96

FILED IN OFFICE
CLERK OF SUPERIOR COURT
HENRY COUNTY, GA.

ANDERSEN, DAVIDSON & TATE, P.C.
P. O. BOX 2000
LAWRENCEVILLE, GA 30246-2000

## WARRANTY DEED

STATE OF GEORGIA

COUNTY OF GWINNETT

This Indenture made the 20th day of DECEMBER in the year One Thousand Nine Hundred Ninety-Six, between

JOHN BAMBERG

of the County of HENRY, State of Georgia, as party or parties of the first part, hereinafter called Grantor, and

JOHN BAMBERG AND KIM T. BAMBERG, AS JOINT TENANTS WITH RIGHT OF SURVIVORSHIP

as party or parties of the second part, hereinafter called Grantee (the words "Grantor" and "Grantee" to include their respective heirs, successors and assigns where the context requires or permits).

WITNESSETH that: Grantor, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other good and valuable consideration in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, aliened, conveyed and confirmed, and by these presents does grant, bargain, sell, alien, convey and confirm unto the said Grantee,

All that tract or parcel of land lying and being in Land Lot 28 of the 12th District of Henry County, Georgia, being shown and designated as Lot 41, Eagle Ridge Subdivision, Unit IV, Henry County, Georgia, according to a Plat of Subdivision recorded in Plat Book 24, Page 254, Henry County, Georgia Records, which Plat is incorporated by reference herein and made a part hereof.

Subject to that certain Security Deed of even date to Homesouth Mortgage Corporation.

TO HAVE AND TO HOLD the said tract or parcel of land, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of the said Grantee forever in FEE SIMPLE.

AND THE SAID Grantor will warrant and forever defend the right and title to the above described property unto the said Grantee against the claims of all persons whomsoever.

IN WITNESS WHEREOF, Grantor has hereunto set Grantor's hand and seal this day and year first above written.

Signed, sealed and delivered in the presence of:

_____                    _____ (Seal)
Witness                                        JOHN BAMBERG

_____                    _____ (Seal)
Notary Public

GEORGIA HENRY COUNTY
I CERTIFY THAT THE FOREGOING
IS A TRUE AND EXACT COPY OF THE
ORIGINAL WHICH APPEARS OF RECORD
IN THIS OFFICE BK ____ 2469
PG ____ 136
IN WITNESS WHEREOF I HAVE
THIS 21 DAY OF April 2014
AFFIXED MY SEAL AND SIGNATURE
BARBARA A. HARRISON – HENRY SUPERIOR COURT

HENRY COUNTY GEORGIA
REAL ESTATE TRANSFER TAX
PAID $ –0– (under 100) or
DATE 12-27-96
_____
Clerk of Superior Court

031980

Exhibit "A-7"



PLAT BOOK 24 PAGE 254
GEORGIA, HENRY COUNTY
I CERTIFY THAT THE FOREGOING IS A TRUE AND EXACT COPY OF THE ORIGINAL WHICH APPEARS OF RECORD IN THIS OFFICE BK PG
IN WITNESS WHEREOF THIS THE 21 DAY OF
AFFIXED MY SEAL AND SIGNATURE
BARBARA A. HARRISON - HENRY SUPERIOR COURT
Filed in office this the 19 day of September 19 95
Clerk Superior Court
APPROVED FOR RECORDING
APPROVED FOR RECORDING:
EAGLE RIDGE
CIVIL DESIGN, INC
SEAL OF HENRY SUPERIOR COURT
A.D. 1822
GEORGIA

exhibit "A-8"

When Recorded, Return to:

Bamberg Family Irrevocable Living Land Trust
749 Johnson Court
Stockbridge, GA 30281

# DECLARATION OF HOMESTEAD

1. I, Kem Bamberg, DO HEREBY DELCARE:

2. THAT MY MAILING ADDRESS FOR MY HOMESTEAD IS:
   749 Johnson Court
   Stockbridge, GA 30281

3. I am now residing on the Land and premises located in the city of Stockbridge, County of Henry, State of Georgia, known and legally described as:

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 28 of the 12th District of Henry County, Georgia and being Lot 41, EAGLE RIDGE SUBDIVISION UNIT IV, according to a plat of subdivision recorded in Plat Book 24, Page 264, Henry County, Georgia records, to which reference is hereby made for the purpose of incorporating the same herein. Said legal description being controlling, however the property is more Commonly known as 749 Johnson Court, Stockbridge, Georgia 30281.

4. I am DECLARED HOMESTEAD HEAD OF HOUSEHOLD OWNER OF THE DECLARED HOMESTEAD.

5. NO FORMER DECLARATION OF HOMESTEAD HAS BEEN MADE BY ME EXCEPT AS HAS BEEN ABANDONED.

1


Exhibit "B" A-9

DATE: May 29,        2014   Signature: Kem Bamberg

STATE OF GEORGIA
COUNTY OF HENRY

I, Kem Bamberg being duly sworn on oath, deposes and says:  that as signer to this
DECLARATION OF HOMESTEAD, all statements made herein are true and correct to the best of my
knowledge and belief.
On this __29__ day of ____May____, __2014__ before me,
__Mike Zabetakis__, personally appeared Kem Bamberg, know to me (or satisfactorily
proven) to the person whose name is subscribed to the within instrument and acknowledged that
he/she executed the same as Homestead for the purposes therein contained.

In witness whereof I hereunto set my hand and official seal

_Mike Zabetakis_
Notary Public

          MIKE ZABETAKIS
     Notary Public, Clayton County, GA
     My Comm. Expires Aug. 26, 2015

Title (and Rank)
My commission expires __08/26/2015__

2

Exhibit A-10

# EXHIBIT F

1928 (45 Stat. 684; 43 U.S.C., sec. 80), as amended [sections 80 and 80a of this title], are hereby repealed, and all other provisions of law inconsistent with this Act [See References in Text note above] are repealed to the extent of such inconsistency."

### TRANSFER OF FUNCTIONS

For transfer of functions of other officers, employees, and agencies of Department of the Interior, with certain exceptions, to Secretary of the Interior, with power to delegate, see Reorg. Plan No. 3 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1262, set out under section 1451 of this title.

Words "officials of district land offices" substituted for "registers" on authority of section 403 of Reorg. Plan No. 3 of 1946. See note set out under section 1 of this title.

### EXTENSION TO ALASKA

Section 5 of act Apr. 24, 1944, provided that the provisions of this Act [see References in Text note above] not extend to the territory of Alaska.

### § 79d. Alaska land claimant liable for fees, commissions or purchase money; deposit in Treasury

No provision of this Act shall relieve any public land claimant from the necessity of making payment of fees, commissions, or purchase money required by law or regulation in connection with an application, selection, location, or lease of public lands in Alaska, and all such payments, when made, shall be covered into the Treasury of the United States.

(Oct. 9, 1942, ch. 584, § 5, 56 Stat. 779.)

### REFERENCES IN TEXT

This Act, referred to in text, is act Oct. 9, 1942, ch. 584, 56 Stat. 778, which enacted sections 79d and 123a of this title and sections 366 and 367 of Title 48, Territories and Insular Possessions, amended sections 80 and 751b of this title, repealed sections 366 and 367 of Title 48, and enacted provisions formerly set out as notes under section 366 of Title 48. For complete classification of this Act to the Code, see Tables.

### CODIFICATION

Section was formerly classified to section 367a of Title 48, Territories and Insular Possessions.

### §§ 80, 80a. Repealed. Apr. 24, 1944, ch. 177, § 4, 58 Stat. 215

Section 80, R.S. §§ 2237, 2240; acts Oct. 28, 1921, ch. 114, § 1, 42 Stat. 208; May 21, 1928, ch. 661, 45 Stat. 684; Aug. 22, 1935, ch. 602, 49 Stat. 680; Oct. 9, 1942, ch. 584, § 7, 56 Stat. 779, provided that from and after Sept. 1, 1935, registers should be paid $2,000 per annum together with fees and commissions limited to $3,600 per annum. See section 79c of this title.

Section 80a, R.S. §§ 2237, 2240, provided that receivers should be paid $500 per annum together with fees and commissions limited to $3,000 per annum. See section 79c of this title.

### § 81. Repealed. Pub. L. 89–554, § 8(a), Sept. 6, 1966, 80 Stat. 632, 645, 646

Section, R.S. § 2243; acts Oct. 28, 1921, ch. 115, § 1, 42 Stat. 208; Mar. 3, 1925, ch. 462, 43 Stat. 1145, related to commencement of compensation of registers.

### § 82. Repealed. Pub. L. 86–649, title II, § 202(b), July 14, 1960, 74 Stat. 507

Section, R.S. § 2238; acts May 14, 1880, ch. 89, § 2, 21 Stat. 141; Dec. 17, 1880, ch. 2, 21 Stat. 311; July 26, 1892,

ch. 251, 27 Stat. 270; Mar. 22, 1904, ch. 748, 33 Stat. 144; May 29, 1908, ch. 220, § 14, 35 Stat. 468; Jan. 24, 1923, ch. 42, 42 Stat. 1179; June 5, 1924, ch. 264, 43 Stat. 395; Mar. 3, 1925, ch. 462, 43 Stat. 1145, related to fees and commissions required to be collected by district land offices. See section 1734 of this title.

### § 83. Transcripts of records as evidence

Transcripts of the records in the district land offices, when made and duly certified to by the Secretary of the Interior or such officers as he may designate for individuals, shall be admitted as evidence in all courts of the United States and the Territories thereof, and before all officials authorized to receive evidence, with the same force and effect as the original records.

(Mar. 22, 1904, ch. 748, 33 Stat. 144; Oct. 28, 1921, ch. 114, § 1, 42 Stat. 208; Mar. 3, 1925, ch. 462, 43 Stat. 1145; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

### CODIFICATION

The words "and receivers" which followed "registers" in the original text were omitted as superseded by acts Oct. 28, 1921, and Mar. 3, 1925, providing for consolidation of the two offices. See, also, Transfer of Functions note below.

### TRANSFER OF FUNCTIONS

For transfer of functions of other officers, employees, and agencies of Department of the Interior, with certain exceptions, to Secretary of the Interior, with power to delegate, see Reorg. Plan No. 3 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1262, set out under section 1451 of this title.

Words "district land offices" substituted for "offices of registers" and "the Secretary of the Interior or such officers as he may designate" substituted for "them" on authority of section 403 of 1946 Reorg. Plan No. 3 of 1946. See note set out under section 1 of this title.

### FEDERAL RULES OF CIVIL PROCEDURE

Proof of official records, see rule 44, Title 28, Appendix, Judiciary and Judicial Procedure.

Effect of rule 44 on this section, see note by Advisory Committee set out under that rule.

### CROSS REFERENCES

Government records and papers; copies, see section 1733 of Title 28, Judiciary and Judicial Procedure.

### § 84. Repealed. Pub. L. 86–649, title II, § 202(b), July 14, 1960, 74 Stat. 507

Section, R.S. § 2239; acts Oct. 28, 1921, ch. 114, § 1, 42 Stat. 208; Mar. 3, 1925, ch. 462, 43 Stat. 1145, related to fees for consolidated land offices. See section 1734 of this title.

### § 85. Omitted

### CODIFICATION

Section, acts Mar. 3, 1887, ch. 362, 24 Stat. 526; Oct. 28, 1921, ch. 114, § 1, 42 Stat. 208; Mar. 3, 1925, ch. 462, 43 Stat. 1145; May 21, 1928, ch. 661, 45 Stat. 684, which required all fees collected by registers which would increase their salaries beyond a certain amount to be covered into the Treasury, except for certain clerical fees, was superseded by sections 79c and 79d of this title, which require all fees to be covered into the Treasury.

### § 86. Accounting for fees for notices of cancellation of entries

On and after March 4, 1911, all money or fees received or collected by the Secretary of the In-